## Case No. 14,968.

### UNITED STATES v. DIXON.

[1 Cranch, C. C. 414.][1]

Circuit Court, District of Columbia.  June 25, 1807.

CRIMINAL LAW — INDICTMENT FOR BURGLARY — CONVICTION OF LARCENY—RETRACTING PLEA OF GUILTY.

1. Upon an indictment for burglary, the jury may find the prisoner guilty of larceny only.

2. Upon an indictment for larceny at common law, the court may render judgment according to the statute.

3. The court will suffer the prisoner to retract his plea of guilty in a capital case, and to plead not guilty.

---

## Case No. 14,969.

### UNITED STATES v. DIXON.

[2 Cranch, C. C. 92.][1]

Circuit Court, District of Columbia.  Dec. Term, 1813.

SALE OF LIQUORS — POWER TO GRANT LICENSE — CITY OF WASHINGTON.

[Cited in U. S. v. Holly, Case No. 15,381.]

---

## Case No. 14,970.

### UNITED STATES v. DIXON.

[4 Cranch, C. C. 107.][1]

Circuit Court, District of Columbia.  Dec. Term, 1830.

COMMON GAMING-HOUSE — INDICTMENT — COMMON LAW OFFENCE.

It is an indictable offence at common law to keep a common gaming-house, and for lucre

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

and gain to cause idle and evil disposed persons to come and play together there, and to game for divers large and excessive sums of money, to the common nuisance of the citizens of the United States.

[Cited in Marcus v. U. S., Case No. 9,062a.]
[Cited in People v. Sponsler, 1 Dak. 289, 46 N. W. 460.]

Indictment for a common nuisance in keeping a common gambling-house for playing at the unlawful game called faro. The indictment was founded upon the model of that in the case of Rex v. Rogier, 1 Barn. & C. 272, 8 Serg. & L. 75, and charged, "that the said Jacob Dixon did, on," &c., "at," &c., "and on divers days and times," &c., "with force and arms at," &c., "unlawfully keep and maintain a certain common gambling-house, and in the said gambling-house, for lucre and gain, on the said first day of January and on the other times aforesaid, then and there, did unlawfully and wilfully cause and procure divers idle and evil disposed persons to frequent and come to play together at a certain unlawful game called faro, and in the said common gaming-house on the said first day of January," &c., "unlawfully did permit and suffer the said idle and evil disposed persons to be and remain playing at the said unlawful game called faro, for divers large and excessive sums of money; to the great damage and common nuisance of the good citizens of the United States, to the evil example of all persons in like cases offending, and against the peace and government of the United States."

The jury having found the defendant guilty upon this indictment, Coxe & Dandridge, for defendant, moved in arrest of judgment, and for a new trial; and after full argument on the part of the defendant, Mr. Swann, for the United States, cited the precedent in Archb. Cr. Law, 363, and submitted the case to the court.

CRANCH, Chief Judge, delivered the opinion of the court (THRUSTON, Circuit Judge, absent), as follows:

Coxe & Dandridge have moved the court in arrest of judgment, and contend that the matters charged in the indictment do not constitute an offence at common law. That at common law no game or gaming was unlawful; nor was it unlawful to keep a common gaming-house; and to this point they cited 3 Reeves, Eng. Law, pp. 170, 293; 1 Curwood's Hawk. P. C. 721; Jac. Law Dict. "Gaming"; 9 Anne, c. 14; 4 Tuck. Bl. 171; Com. v. Richards, 1 Va. Cas. 133; 3 Chitty, for the forms of indictment containing a count for a disorderly house. Rex v. Rogier, 1 Barn. & C. 272; Hawk. P. C. bk. 1, c. 32, § 2; Rex v. Dixon, 10 Mod. 335; 33 Hen. VIII. c. 9, § 12; 1 Doug. 60, 61, in Chandler v. Roberts, referring to 10 Mod. 256. The British statutes of 16 Car. II. c. 7, against deceit in gaming; 9 Anne, c. 14, § 1, avoiding securities for money lost at gaming; Id. § 2, providing that if more than £10 be lost at play, at one sitting, it may be recovered; and section 3, requiring the winner to answer on oath, are in force in this country. But the English and British statutes, prohibiting certain games to certain classes of persons, never were in force in Maryland, and, consequently, are not in force here. The act of 1797 (chapter 110, § 2) is the only act in force in this county, for restraining any kind of games, except the by-laws of the corporations of Washington and Georgetown; and that act only prohibits the setting up, keeping, and maintaining certain gaming-tables, or devices, in any tavern, or house occupied by a retailer of wine, spirituous liquors, &c. The game of faro is not an unlawful game. No person can be punished under that statute for playing at that game, whether it be played in a tavern or a private dwelling-house. The offence under the statute, is the setting up and maintaining the table or device.

The indictment, therefore, in the present case, derives no assistance from any statute; nor does the playing at faro constitute any part of the offence. If it can be supported at all, it must be as an indictment for a common nuisance in keeping a common gaming-house, for lucre and gain, at which divers idle and dissolute persons were permitted to assemble and game for divers large and excessive sums of money. Hawkins (book 1, c. 75, § 6) says: "Also it hath been said that all common stages for rope-dancers, and, also, all common gaming-houses, are nuisances in the eye of the law;" "not only because they are great temptations to idleness, but, also, because they are apt to draw together great numbers of disorderly persons, which cannot but be very inconvenient to the neighborhood." And in section 7, he says: "And it seems to be a proper distinction between playhouses and the nuisances mentioned in the foregoing section; that playhouses having been originally instituted with a laudable design of recommending virtue to the imitation of the people, and exposing vice and folly, are not nuisances in their own nature, but may only become such by accident; whereas the others cannot but be nuisances." Hawkins cites Higginson's Case, 2 Burrows, 1232, for keeping and maintaining "a certain common, ill-governed, and disorderly house, and in the said house, for his own lucre and profit, certain evil and ill-disposed persons, of ill name and fame, and of dishonest conversation, to frequent and come together, then and there unlawfully did cause and procure; and the said persons, in the said house, then," &c., "and there to be and remain; fighting of cocks, boxing, playing at cudgels, and misbehaving themselves, unlawfully and wilfully did permit, and yet doth permit; to the great damage and common nuisance of all the subjects of our said lord the king, inhabiting near the said house, and against the peace," &c. Upon a motion in arrest of judgment this indictment was adjudged good, by the court of king's bench. He cites, also, Rex v. Howel, 3 Keb. 465, 510, which was an indictment at common law for keeping a cock-

pit six days, for which he was fined forty shillings a day, the court making the statute of 33 Hen. VIII., c. 9, § 11, the rule of the fine, although the indictment was not under that statute. He also cites Rex v. Dixon, 10 Mod. 336. The court there said, that the keeping of a gaming-house was an offence indictable at common law. In that case, indeed, the indictment was upon the statute of 33 Hen. VIII. c. 9, § 11; and the objection was, that the statute, having chalked out a particular method of proceeding for the recovery of the penalty of forty shillings a day, indictment would not lie. But the court said, that "where the statute gives a new penalty, or a new remedy for a common-law offence, the remedy at common law shall not be taken away without negative words."

It was also objected, that if it were to be considered as an indictment at common law, it would not be good, for want of concluding "ad commune nocumentum"; but the court said it was "not necessary to conclude so here; the offence, in its own nature, importing that it is so. Besides, the word 'common' supplies this defect, if it were one." The statute of 9 Anne, c. 14, which makes playing at any game unlawful, if more than £10 shall be lost at one sitting, is in force in this country.

The indictment, in this case, is taken from the precedent in Archbold's Criminal Pleading (page 363), which is the exact form used in the case of Rex v. Rogier, 1 Barn. & C. 272; in which case Abbott, C. J., upon a motion in arrest of judgment, said, "I have no doubt that the facts stated in this indictment constitute an offence at common law. Hawkins, in the passage which has been cited, observes, 'It has been said that common gaming-houses are nuisances in the eye of the law;' and then he assigns the reason, namely, that they tend to produce certain evil consequences; which is not very different from saying that they are nuisances, if those consequences are produced. Since his time, many parties have been convicted upon indictments in which the keeping of such a house has been charged to be an offence at common law." After stating that the recitals in the statute of 25 Geo. II. c. 36, are "a legislative declaration that the keeping of a gaming-house is an indictable offence." Mr. Chief Justice Abbott proceeds: "Besides, the 9 Anne, c. 14, § 2, makes playing at any game unlawful if more than £10 shall be lost. Now, in this case, the indictment states, not only that the defendants kept a common gaming-house, but that they permitted persons to play there for divers large and excessive sums of money. The playing for large and excessive sums of money would, of itself, make any game unlawful; and, if so, there can be no doubt that this is an offence at common law." Bayley, Holroyd, and Best, Justices, concurred, and Holroyd, J., further added, "that in his opinion, it would have been sufficient merely to have alleged that the defendants kept a common gaming-house." The motion in arrest of judgment was overruled. It may be observed, that in that case the judges laid no stress upon the fact charged in the indictment, that the defendant caused persons to come to play together at a certain unlawful game called rouge et noir; nor have I been able to find, that at the time when that case was decided the game of rouge et noir had been made unlawful by any statute. The statute of 33 Hen. VIII. c. 9, repealed all the former "statutes made for the restraint of unlawful games, or for the maintenance of artillery, as touching the penalties and forfeitures of the same." By the eleventh section, it is enacted, That no person shall, for his gain, lucre, or living, keep "any common house, alley, or place, or place of bowling, coyting, cloysh, cales, halfbowl, tennis, dicing-table, or carding, or any other manner of game prohibited by any estatute heretofore made; or any unlawful new game now invented or made; or any other new unlawful game hereafter to be invented, found, had, or made; upon pain to forfeit and pay for every day keeping, having or maintaining, or suffering any such game to be had, kept, executed, played, or maintained, within any such house, garden, alley, or other place, contrary to the form and effect of this estatute, forty shillings."

The first statute, prohibiting any kind of game, was that of 12 Rich. II. c. 6 (Anno 1388), and applied only to servants of husbandry, laborers, and servants of artificers and victuallers; not to servants of gentlemen; and it commands them to refrain from such games as "hand and foot ball, coits, dice, throwing of stone keyles, and such other importune games." The statute of 11 Hen. IV. c. 4 (Anno 1409), enforces the 12 Rich. II. c. 6, against laborers and servants playing at such unlawful games, by six days' imprisonment. The statute of 17 Edw. IV. c. 3 (Anno 1477), "For unlawful games," says: "That as, according to the laws of this land, no person shall use any unlawful games, that is to say, coits, foot-ball, or such like games;" "contrary to which laws, the said games, and divers newly-devised games called cloish, kayles, half-bowle, hand-in-and-hand-out, and quekeborde, from day to day, are used in divers parts of this land;" "which gamesters are daily supported and favored by the masters and occupiers of divers houses, tenements, gardens, and other places in which they use, and play at their said ungracious and not commendable games;" wherefore, it was enacted, that no occupier or master of any house, tenement, &c., should voluntarily suffer any person to play at any of the said games, in any their said houses, tenements, &c., or any other place, under pain of imprisonment for three years, and to lose for every default £20. And that no person should use or play at any of the said games, under pain of two years' imprisonment, and £10 for every default. The statute of 11 Hen. VII. c. 2 (Anno 1494), provided, that no artificer, laborer, or servant, should play at any unlaw-

ful game, but in Christmas. But by the statute of 19 Hen. VII. c. 12 (Anno 1503), certain persons were forbidden to play at unlawful games. The statute 3 Hen. VIII. c. 3 (Anno 1511), provided that unlawful games should not be used. By the statute 27 Hen. VIII. c. 25 (Anno 1535), "there shall be no playing at unlawful games." These are all the statutes upon the subject prior to 33 Hen. VIII. c. 9. The titles only of the last four are given in Ruffhead's edition of the statutes, it being stated in the margin, that they were repealed by 33 Hen. VIII. c. 9. No principles are stated in any of them by which it can be ascertained what newly-invented games, (that is, games invented after these statutes,) should be deemed unlawful. The 12th section of the statute of 33 Hen. VIII. c. 9, makes it penal in any person to haunt the gaming-houses mentioned in the 11th section, and to play there. By the 13th section certain placards or licenses might be obtained, expressing what games should be used, and what persons should play thereat; security being given by recognizance to the lord chancellor, not to use the placard contrary to the form thereof. The 16th section provides, "that no manner of artificer, or craftsman of any handicraft or occupation, husbandman, apprentice, laborer, servant at husbandry, journeyman, or servant of artificer, mariners, fishermen, waterman, or serving-man," "shall play at the tables, tennis, dice, cards, bowls, clash, coyting, logating, or any other unlawful game, out of Christmas, under pain of 20s. to be forfeit for every time; and at Christmas to play at any of the said games in their masters' houses, or in their masters' presence; and also that no manner of persons shall, at any time play at any bowls in open places out of his garden or orchard, upon pain," &c. By the 21st section, leases of gaming-houses were to be void. By the 22d and 23d sections, masters might license their servants to play with themselves or other gentlemen. This statute did not prohibit gaming of any kind, at all times by all persons, and at all places; so that there was not, in truth, any game which was in itself unlawful. It only became unlawful by being used by certain persons, or in certain places, or at certain times.

The keeping of a common house for any unlawful game, for lucre and gain was prohibited; but no game was made unlawful unless played at such common house. The statutes thus formed a circle. Every game played in a common gaming-house, was unlawful; and every common house for playing at an unlawful game was unlawful. Some other games are prohibited by name, in subsequent statutes, and all games with dice, except back-gammon; but the game of rouge et noir is not, as far as I have been able to search, mentioned in any of them. It was not, therefore, an unlawful game, unless made so by being played in an unlawful place, or by persons not authorized to play it, or at an improper time. If all games were unlawful when played in a common gaming-house, then it was unlawful because it was played in such a house. But, as I have before said, the court, in the case of Rex v. Rogier, did not lay any stress upon its being, in itself, an unlawful game. They seem to have decided the cause entirely upon the ground that a common gaming-house, kept for lucre and gain, at which persons are permitted to play for large and excessive sums of money, is, per se, a common nuisance. The reason why it is to be considered as a common nuisance, is, that it tends to draw together idle and evil disposed persons; to corrupt their morals, and to ruin their fortunes; which is the same reason which is given in the case of houses of common prostitution. It is not because the game played in such a gaming-house is, in itself, an unlawful game, but because it is a common gaming-house kept for lucre and gain, where persons are permitted to play for money and other valuable property.

It has been said, in argument, that if the law be so, every man who has a whist-party at his house is liable to be prosecuted and punished for a nuisance. But the distinction is broad and palpable. To become a common nuisance, it must be a common gaming-house, kept for lucre and gain; holding out allurements to all who are disposed to game, and kept for that purpose. We entirely concur with the English judges, in saying that we have no doubt that the facts stated in this indictment, constitute an offence at common law.

The motion in arrest of judgment must therefore be overruled.

But there is also a motion for a new trial; and it is understood that the grounds are: (1) That there was no evidence that the playing was for large and excessive sums of money, which is a necessary constituent in the offence. (2) That there was no evidence that it was in fact a common nuisance; nor that idle and evil-disposed persons were there; nor that it was a common gaming-house, open to everybody. (3) That only one instance of playing was proved.

1. As to the first ground, the evidence was that the defendant kept a faro-bank, and the jury may be presumed to know the nature of the game and may have inferred from it, as they had a right to do, that whenever the game is played, it is for large sums; and that large sums are generally won and lost at that game.

2. It is not necessary to prove that it was a common nuisance. It was sufficient to prove that it was a common gaming-house, kept for lucre and gain.

3. It is not necessary to prove more than one act of gaming. It may be proved to be kept as and for a common gaming-house by other evidence than that of its having been often used as such.

Motion overruled.