Argued 5 April, decided 15 May, 1905.

## STATE v. NEASE.

80 Pac. 897.

POOL ROOM AS PUBLIC NUISANCE—GAMBLING.

1. A pool room in which persons daily congregate to bet upon horse races reported to the proprietor by telegraph, is a gaming house, punishable as a nuisance at common law.

POWER OF CITY TO LICENSE POOL ROOM—CONSTRUCTION OF CHARTER.

2. A city which by its charter is authorized to prevent and suppress gaming and gambling houses is not authorized to make such places lawful by licensing them.

STATUTES—MAINTAINING POOL ROOM—NUISANCE.

3. Under B. & C. Comp. § 1930, providing for the punishment of persons who willfully and wrongfully commit any act which grossly disturbs the public peace or health, or which openly outrages the public decency, and is injurious to the public morals, it is not necessary, to constitute the offense, that there should be an actual breach or, disturbance of the peace, or actual or threatened violence, but any immoral or criminal act which disturbs the quiet and tranquillity of society, to the injury of public order and decorum, or disturbs or threatens the public peace, and which would constitute a nuisance at common law, is within the statute, as, for example, maintaining a gambling house or pool room.

STATUTES—CONSTRUCTION OF AS AFFECTED BY NONUSER:

4. The fact that a penal statute has been on the statute books for over forty years, and has not been applied in a particular manner, does not preclude the application and enforcement of the statute in that manner if it may properly be so applied and enforced.

From Multnomah: ARTHUR L. FRAZER, Judge.

M. G. Nease appeals from a conviction of committing an act grossly disturbing the public peace by maintaining a pool room in the City of Portland.          AFFIRMED.

For appellant there was an oral argument by *Mr. Edward B. Watson* and *Mr. John M. Gearin,* with a brief over the names of *Watson & Beckman, Dolph, Mallory, Simon & Gearin,* and *William P. Lord,* to this effect.

I. There are no common law offenses in this State, and no crimes except those named in the statutes: *State* v. *Vowels,* 4 Or. 324, 326; *State* v. *Gaunt,* 13 Or. 115 (9 Pac. 55) ; 6 Am. & Eng. Enc. Law (2 ed.), 290.

II. The prosecution seeks to make out its case by construing Section 1930 of B. & C. Comp. into an adoption or reenactment of the common law on the subject of indictable nuisance. This section does not make any reference in terms to the common law, nor employ any word descriptive of an indictable nuisance at common law, nor specify the elements of such offense at common law, and it is impossible to hold that the legislature, in

[28—46 Or.]

enacting the same, intended to restore the common law, without passing clear beyond any literal, or even probable, meaning of the words it has employed, which is not permissible under any rule for the construction of penal statutes.

The established rule does not allow the extension of words beyond their fair and reasonable meaning, nor permit any case to be brought within the statute "unless completely within its words": Bishop, Stat. Cr. (2 ed.), §§ 216, 220; *State* v. *Mann,* 2 Or. 238, 241.

The intention of the legislature to adopt or re-enact any provision of the common law against criminal offenses must be expressly declared in terms, or clearly implied from the employment of words having a definite and settled meaning in the common law; otherwise the statute can have no force or operation beyond the literal interpretation of its own terms. Criminal offenses cannot be created by construction: Sutherland, Stat. Const. §§ 253, 291, 350; Bishop, Stat. Cr. (2 ed.), § 220.

III. A "gross" disturbance of the public peace involves not only an actual breach of peace, but the commission thereof with more than an ordinary degree of force or violence, or under circumstances more than ordinarily calculated to produce fright or alarm: Anderson, Law Dic. 761; 4 Am. & Eng. Enc. Law (2 ed.), 902; 2 Wharton, Crim. Law, § 1555; 1 Bishop, Crim. Law, § 560; *State* v. *Warner,* 34 Conn. 276; *Ware* v. *Branch,* 75 Mich. 493 (42 N. W. 997, 1000) ; *Peabody* v. *Peabody,* 104 Mass. 195, 197.

Actual disturbance of the public peace was not an element of criminal nuisance at common law (2 Wharton, Crim. Law, § 1465; *People* v. *Sergeant,* 8 Cow. 139, 141; *State* v. *Layman,* 5 Har. 510) ; and the "act which openly outrages public decency and is injurious to public morals" has uniformly been construed to include only displays of the naked person, the publication, sale or exhibition of obscene books and prints, and the like, containing the element of obscenity: Anderson, Law Dic. 534; *McJunkins* v. *State,* 10 Ind. 145; *Knowles* v. *State,* 3 Day, 103; *State* v. *Rose,* 32 Mo. 560; *Gilmore* v. *State,* 118 Ga. 299 (45 S. E. 787).

IV. A licensed business cannot be adjudged a nuisance, even if it is in its nature against public policy or against the highest standard of public morality: *State* v. *Mosly,* 14 Ala. 390; *State* v. *Alaire,* 14 Fla. 435; *State* v. *Jones,* 26 Ala. 155; *State* v. *Hawkins,* 33 Ala. 433; *Hinchman* v. *Patterson,* 17 N. J. Eq. 77; *Davis* v. *Mayor,* 14 N. Y. 506 (67 Am. Dec. 186) ; *State* v. *Overby,* 18 Fla. 178; *State* v. *Stearne,* 21 Tex. 695; *State* v. *Houghton,* 41 Tex. 136; *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Rutherford* v. *State,* 45 S. W. 579.

Where the offense charged belongs to criminal nuisances, as understood at common law, we have no such section or provisions. The absence of them is what reduces the State to the necessity of trying to read into Section 1930 that the offenses it enumerates are common nuisances, as defined at common law, to sustain the indictment, charging the defendant with maintaining a public nuisance. As this section has no common law word, or definition, no description or specification of a common law offense, no words indicating an intention to adopt the common law, as to indictable nuisances, it cannot have read into it by construction a common law offense, or other offense than its language describes in its ordinary meaning. Upon the wording of the section it is not possible to predicate a common law nuisance; that can only be done, if it can be done at all, by the legislature amending the section declaring the offenses to be public nuisances. We feel that we are entitled to a reversal on the broad ground that our Section 1930, of B. & C. Comp. does not, either in terms or by description of the offense, adopt or re-enact the common law against criminal nuisances, and that the words of the statute cannot be extended by construction so as to include it.

For the State there was an oral argument by *Mr. Andrew M. Crawford,* Attorney General, and *Mr. Henry E. McGinn,* with a brief over the names of *Mr. Crawford, Mr. John Manning,* District Attorney, and *Mr. McGinn,* to this effect.

1. Horse racing is a game within the meaning of Section 1944, B. & C. Comp., where a contrivance, such as a blackboard, or a "Paris Mutual" or "French Pool" machine is employed to enable one to bet more intelligently or safely, and lessen the

chances of disaster to himself. A device is included in the expression "any other device" of Section 1944: 14 Am. & Eng. Enc. Law (2 ed.), 682; *Swigart* v. *People,* 154 Ill. 284, 290 (40 N. E. 432) ; *Commonwealth* v. *Simonds,* 79 Ky. 618; *People* v. *Weithoff,* 51 Mich. 203 (47 Am. Rep. 557, 16 N. W. 442) ; *Miller* v. *United States,* 6 App. Cas. D. C. 6; *People* v. *Weithoff,* 93 Mich. 631 (32 Am. St. Rep. 532, 53 N. W. 784) ; *Tallett* v. *Thomas,* Law R. 6 Q. B. 514, 521. Opposed is *State* v. *Shaw,* 39 Minn. 153, 154, criticised in 14 Am. & Eng. Enc. Law (2 ed.), 709.

2. Section 1930, B. & C. Comp., is a re-enactment of the common law on the subject of "public nuisance" in the particulars specified, to-wit, public health, public peace, and public morals. Whatever therefore could be punished at common law, because of its tendency to grossly disturb the public peace, or the public health, or openly outrage the public decency and to injure public morals can be punished under our statute: *State* v. *Bertheol,* 6 Blackf. 474 (39 Am. Rep. 442) ; *Burk* v. *State,* 27 Ind. 430; *State* v. *Taylor,* 29 Ind. 517; *State* v. *Berdetta,* 73 Ind. 185 (38 Am. Rep. 117) ; *Western Union Tel. Co.* v. *Scircle,* 103 Ind. 227 (2 N. E. 604) ; *State* v. *Friend,* 47 Minn. 449 (50 N. W. 692) ; *United States* v. *Jones,* 3 Wash. (C. C.), 209; Sutherland, Stat. Const. §§ 247, 253; Endlich, Interp. Stat. §§ 3 and 75.

3. To learn the meaning of such phrases as "grossly disturbs the public peace" or "openly outrages the public decency and is injurious to public morals" one turns to the common law of nuisance, and there finds that from time immemorial the keeper of a gaming house was guilty of maintaining a public nuisance and was punishable as such, though what was carried on in the gaming house may in itself be innocent and not prohibited by law, and the reasons assigned by the common law judges and writers were that the keeping of such places tended to disturb the public peace, to outrage decency and to injure public morals: 1 Hawkins, Pleas of the Crown (Curwood's ed.), 693, §§ 6 and 7; 1 Bishop, New Crim. Law, § 1135; 14 Am. & Eng. Enc. Law (2 ed.), 697; *Thrower* v. *State,* 117 Ga. 753 (45 S. E. 126) ; *Jenks* v. *Turpin,* 13 Q. B. D. 505; *Thatcher* v. *State,* 48 Ark.

60 (2 S. W. 343) ; *Vanderworker* v. *State*, 13 Ark. 700; *King* v.
*People*, 83 N. Y. 587; *State* v. *Mosby*, 53 Mo. App. 571; *Lord*
v. *State*, 16 N. H. 325, 330 (41 Am. Dec. 729) ; *State* v. *Black*,
94 N. C. 812; *State* v. *Bertheol*, 6 Blackf. 474 (39 Am. Rep.
442) ; *State* v. *Haines*, 30 Me. 65; *People* v. *Jackson*, 3 Denio,
101; *State* v. *Layman*, 5 Har. (Del.), 510; *State* v. *Williams*,
30 N. J. L. 104; *Commonwealth* v. *Cobb*, 120 Mass. 356; *Cheek*
v. *Commonwealth*, 79 Ky. 359; *Bohlinger* v. *Commonwealth*,
98 Ky. 574; *Commonwealth* v. *Cheek*, 100 Ky. 1.

4. The city has no authority to license pool rooms, its power
is limited to preventing and suppressing gaming and gambling
houses: *Odell* v. *City of Atlanta*, 97 Ga. 670; *Schuster* v. *State*,
48 Ala. 199; *State* v. *Caldwell*, 3 La. Ann. 435; 14 Am. & Eng.
Enc. Law (2 ed.), 696, note 7.

The fact that the morality clause of our statute has been most
frequently considered in cases where offenses directed against
modesty and chastity were under consideration seems to have
created the impression that to punish such offenses was the only
office of that clause; but the impression is a very erroneous one.
"Chastity is not the only form of morality protected by the
common law," says Bishop. The erection of mountebank's
stages, gaming, and other disorderly houses, cock fighting,
drunkenness and sepulture are instances cited to show that the
punishment of offenses against modesty and chastity is not the
only purpose of the common law: Bishop, New Crim. Law,
§§ 504, 505, 506; *Kanavan's Case*, 1 Greenleaf, 226.

Our conclusion, then, is that whatever could be punished at
common law, because of its tendency to disturb the public
peace, or because of its tendency to injure the public morals,
may now be punished under the two clauses of Section 1930 of
B. & C. Comp., which we have considered in this brief, unless
it be that the legislative assembly, by some specific enactment
on a subject which was formerly covered by Section 1930, B.
& C. Comp., has by a subsequent statute shown an intention to
so completely cover the subject treated as to leave no doubt that
it intended to repeal pro tanto the right to punish under Section
1930. It will not be claimed that there is any specific law in
Oregon punishing the keeper of either a gaming or a gambling

house, the legislature has legislated against games, but not against keepers of gaming houses. It must follow, therefore, that the keeper of a common gaming house is indictable as the keeper of a common nuisance under Section 1930, B. & C. Comp., precisely as he was at common law. ·

MR. JUSTICE BEAN delivered the opinion of the court.

The defendant was indicted for willfully committing an act which grossly disturbs the public peace, openly outrages the public decency, and is injurious to the public morals, in that he, viz:

"On the 20th day of October, A. D. 1904, and thence continuously until the 1st day of November, 1904, * * did then and there, for gain, habitually sell pools upon horse races, and habitually procure idle and evil-disposed persons to come to his house to buy pools and to bet upon horse races, to the common nuisance and annoyance of all good citizens," etc.

He had previously obtained from the City of Portland a license to conduct a pool room. The trial court held that the license was no protection, and refused to direct an acquittal of the defendant. He was consequently convicted and appeals.

1. The evidence shows that he was the keeper and proprietor of what is called a "turf exchange," or pool room, on one of the principal thoroughfares in the city, at which persons daily congregated for the purpose of betting upon horse races run in other states, and reported to him by telegraph. The odds on every horse in any race of importance about to be run, as made at the race course, were reported to the defendant before the race, and posted for the information of the public on a blackboard in the room used by him. A person desiring to bet would select a horse, pay the amount of his bet according to the odds appearing on the blackboard, and receive from the defendant a ticket showing the sum to which he would be entitled in case the horse selected by him won. As soon as the race was run the result would be immediately telegraphed to the defendant, and he would pay the amount coming to the holders of tickets on the winning horse, less a certain per cent as commission. That such a house is a gaming or gambling house, and punishable as a nuisance at common law, whether betting on a horse

race is a crime or not, has so often and uniformly been held
by the courts that it is no longer open to discussion. There is
no dissent in the adjudged cases, and it is unnecessary to do
more than cite the authorities: *McBride* v. *State,* 39 Fla. 442
(22 South. 711) ; *Thrower* v. *State,* 117 Ga. 753 (45 S. E. 126) ;
*Swigart* v. *People,* 154 Ill. 284 (40 N. E. 432) ; *Swigart* v
*People,* 50 Ill. App. 181; *Cheek* v. *Commonwealth,* 79 Ky. 359;
*People* v. *Weithoff,* 51 Mich. 203 (16 N. W. 442, 47 Am. Rep.
557) ; *People* v. *Weithoff,* 93 Mich. 631 (53 N. W. 784, 32 Am.
St. Rep. 532) ; *McClean* v. *State,* 49 N. J. Law, 471 (9 Atl.
681) ; *Miller* v. *United States,* 6 App. D. C. 6.

2. By its charter the City of Portland is authorized to "prevent
and suppress gaming and gambling houses," but not to make
such places lawful by licensing them: *Schuster* v. *State,* 48
Ala. 199.

3. Nor, as we understand it, are these positions seriously con-
troverted by the defendant, but his contention is that there is no
law in this State for the punishment of the keeper of a common
gaming house; that, although the statute makes certain kinds of
gambling a crime, and punishable as such (B. & C. Comp.
§ 1944), and provides for the punishment of the owner of a
building who suffers or permits gambling to be carried on
therein (B. & C. Comp. § 1949), it does not make the keeping of
a gambling house unlawful, or provide for the punishment of a
keeper or proprietor thereof. Now, there is no statute providing
specifically for such an offense, nor have we any common law of-
fenses, as such: *State* v. *Vowels,* 4 Or. 324; *State* v. *Gaunt,* 13
Or. 115 (9 Pac. 55). But Section 1930 provides "If any person
shall willfully and wrongfully commit any act which grossly
injures the person or property of another, or which grossly dis-
turbs the public peace or health, or which openly outrages the
public decency and is injurious to the public morals, such per-
son, if no punishment is expressly prescribed therefor by this
Code, upon conviction thereof, shall be punished by imprison-
ment in the county jail not less than one month nor more than
six months, or by fine not less than fifty nor more than two
hundred dollars." This section is a part of the original Criminal
Code reported to and adopted by the legislature in October,

1864, and was probably taken bodily from the draft of a Penal Code for the State of New York prepared by David Dudley Field and his associates in · April of that year : Proposed Penal Code, § 736. It has been generally known as the "Nuisance Statute," and prosecutions and convictions for maintaining public nuisances have been had thereunder : *State* v. *Bergman,* 6 Or 341. It was evidently intended to cover such offenses against the public peace, the public health, common decency and the public morals, and such as grossly injure the person or property of another, which are not otherwise made punishable by the Code. This is indicated quite clearly by the marginal index or syllabus accompanying the Code, as reported to the legislature and adopted by it. The section is there described as covering "acts contrary to good morals and common decency." This syllabus became a part of the law, and furnishes, as said by Mr. Justice McArthur, "the highest source from which to draw information as to the nomenclature of the said Code" : *State* v. *Vowels,* 4 Or. 324. It is true, the offenses referred to were technically denominated "nuisances" at common law, and that term does not occur in the statute; but the language used is essentially descriptive of the general character of such offenses, and quite equivalent thereto. Certain acts were punishable as nuisances at common law because they outraged public decency and were against good morals, such as habitual, open and notorious lewdness, roaming the streets naked (Wharton, Crim. Law, § 1432), the indecent exposure of the person on a highway or in a public place *(State* v. *Rose;* 32 Mo. 560; *Gilmore* v. *State,* 118 Ga. 299, 45 S. E. 226), the exhibition of an unseemly or obscene sign or picture *(Knowles* v. *State,* 3 Day, 103; *Commonwealth* v. *Sharpless,* 2 Serg. & R. 91, 7 Am. Dec. 632), and other similar matters. Other acts were likewise punishable because they injuriously affected the public health, such as maintaining slaughterhouses in a populous neighborhood, or the exposing for sale for human food of putrid or infected articles which were injurious to the health, and the like : Wharton, Crim. Law, § 1433, et seq.

Still other acts were punishable because they disturbed or injured the public peace or morals, by congregating large num-

bers of idle and dissolute persons in one place for vicious pur-
poses, and of such were common gaming houses. The keeping
of such a house was a separate and well-defined offense at com-
mon law, entirely independent of the criminality of the busi-
ness conducted therein. It was punishable as a nuisance before
any sort of gambling was prohibited or even considered to be
against public policy, because it tended to draw together dis-
orderly persons, and to encourage vice, idleness, and breaches of
the peace: 4 Cyc. 485; 7 Bacon, Abridg. 223; 3 Archbold,
Crim. Pl. 609; *United States* v. *Dixon,* 4 Cranch, C. C. 107
(Fed. Cas. No. 14970) ; *King* v. *Dixon,* 10 Mod. *336; *King* v.
*Medlor,* 2 Showers, *36; *Jenks* v. *Turpin,* 13 L. R. Q. B. D.
505; *State* v. *Layman,* 5 Har. (Mich.), 510. In Hawkins'
Pleas of the Crown (book 1, c. 32, § 6), it is said: "All common
gaming houses are nuisances, in the eye of the law, * * not
only because they are great temptations to idleness, but also
because they are apt to draw together great numbers of dis-
orderly persons, which cannot but be very inconvenient to the
neighborhood." In 1 Russell on Crimes, p. 741, the principle
upon which common gaming houses are punishable as nui-
sances is said to be that they are "detrimental to the public,
as they promote cheating and other corrupt practices, and incite
to idleness and avaricious ways of gaining property great num-
bers, whose time might otherwise be employed for the good of the
community." Mr. Chief Justice BRONSON says: "I have no
doubt that the keeping of a common gaming house is indictable
at the common law: *The King* v. *Rogier,* 1 B. & C. 272; *People*
v. *Sergeant,* 8 Cow. 139. It is illegal, because it draws together
evil-disposed persons, encourages excessive gaming, idleness,
cheating, and other corrupt practices, and tends to public dis-
order. Nothing is more likely to happen at such places than
breaches of the public peace": *People* v. *Jackson,* 3 Denio, 101
(45 Am. Dec. 449). And in *Vanderworker* v. *State,* 13 Ark.
700, Mr. Chief Justice SCOTT says: "Independent of any stat-
ute, the keeping of a common gaming house is indictable at
common law, on account of its tendency to bring together dis-
orderly persons, promote immorality, and lead to breaches of
the peace. Such an establishment is thus a common nuisance."

The keeping of a gaming house was therefore an offense at common law, because, among other things, it disturbed the public peace and tranquillity, by encouraging idleness, riot, thriftlessness, breaches of the peace, disorderly conduct, and the like.

By Section 1930, the willful and unlawful commission of an act which grossly disturbs the public peace or outrages the public decency and is injurious to public morals, if no punishment is provided by the Code, is made an offense and punished in a certain manner. "Willfully" means a purpose or willingness to commit the act referred to (B. & C. Comp. § 2176), and is equivalent to "knowingly" (*Wong* v. *Astoria,* 13 Or. 538, 11 Pac. 295) ; "wrongfully," that the act was done in violation of right or without authority of law: B. & C. Comp, § 2180. "Grossly" is defined by Webster to mean greatly, coarsely, shamefully, disgracefully; and "disturb," to throw into disorder or confusion, to interrupt the settled state of, to excite from a state of rest, to render uneasy. The statute therefore simply means that one who knowingly and without authority of law commits an illegal act which greatly or shamefully annoys or scandalizes the community, and agitates and disturbs the quiet and tranquillity of the public, or outrages public decency and is injurious to the public morals, is guilty of an offense, and punishable in a certain manner, if no other punishment is expressly provided therefor, and this is substantially the definition of a nuisance at common law: 21 Am. & Eng. Enc. Law (2 ed.), 683. It is not necessary, as counsel for defendant contend, that there should be an actual breach or disturbance of the peace, to come within the statute. Overt acts constituting breaches of the peace are distinct offenses, both by statute and at common law, and actual or threatened violence is an element thereof: *Ware* v. Branch, 75 Mich. 488 (42 N. W. 997). Violence, either actual or threatened, is not a necessary element to constitute the offense under the statute. It is sufficient that the public peace be grossly disturbed, and, as Mr. Bishop says, "the community is disturbed whenever it is alarmed": Bishop, Crim. Law (7 ed.), 541.

An immoral or criminal act, which, while not amounting to a breach of the peace, disturbs the quiet and tranquillity of society to the injury of public order and decorum, or disturbs or threatens the public peace, comes within the statute; and, as we have seen, it has been held by the courts from time immemorial that a common gaming house is of such a character. If the statute had declared the acts prohibited to be nuisances, it would have been no more certain than it now is. It would still have been necessary to resort to the common law to ascertain its meaning. In place of providing, as has been done in many states, for the punishment of nuisances, leaving it to be determined from the common law what specific offenses come within that term, the legislature thought it wiser to adopt the other course, and embody in the statute, as a description of the offenses prohibited, the essential ingredients of a common-law nuisance. There can be no substantial difference, however, between the two methods. One uses the technical name, leaving the essential elements of the offense to be determined from the common law, while the other sets forth the ingredients of the offense, leaving its technical name to be so ascertained. The result is the same.

4. It was said in argument that this section had been on the statute books for more than forty years, and that up to this time there has been no attempt to apply its provisions to common gaming houses, and it is urged that such fact is entitled to conclusive weight as to the practical construction of the meaning and operation of the statute. If the facts assumed in the argument are true—a matter concerning which we have no definite knowledge—it simply shows that the statute has been forgotten or disregarded, and affords no reason why the court should now refuse to administer the law as it is written.　　　AFFIRMED.