Argued December 3, 1970, affirmed March 24, 1971

BROWN ET UX, *Respondents, v.*
JOHNSTON ET UX, *Appellants.*
482 P2d 712

*Harrison R. Winston*, Roseburg, argued the cause and filed a brief for appellants.

*Robert H. Anderson*, Roseburg, argued the cause for respondents. With him on the brief were Stults, Jayne, Murphy & Anderson, Roseburg.

Before O'CONNELL, Chief Justice, and DENECKE, TONGUE, and BRYSON, Justices.

BRYSON, J.

This is an action in trespass for damages wherein plaintiffs claim they sustained injury to a sycamore tree on their residential property. The case was tried to a jury; defendants appeal from the judgment in favor of plaintiffs.

The defendants assign as error the circuit court's denial of their motion for a directed verdict, contending there was no evidence adduced which would support the jury's finding in favor of the plaintiffs. As stated in *Young v. Crown Zellerbach*, 244 Or 251, 259, 417 P2d 394 (1966):

"A trial court should direct a verdict only when

there is a complete absence of proof on some essential issue, or when there is no conflict in the testimony and it is susceptible of only one construction. In considering a defendant's motion for directed verdict, the court should view the evidence in a light most favorable to the plaintiff, and the plaintiff should be accorded the benefit of every favorable inference that may be drawn from the evidence * * *."

To the same effect *see Gordon Creek Tree Farms v. Layne et al*, 230 Or 204, 218, 358 P2d 1062, 368 P2d 737 (1962), and authorities cited therein.

■ A review of the evidence discloses that the parties, plaintiffs and defendants, are each husband and wife and own abutting residential property in Roseburg, Oregon. The plaintiffs have a large sycamore tree on their property, approximately 30″ in diameter through the trunk. The evidence, including a photograph, reveals that the trunk of the tree is some 3″ to 6″ from the defendants' property line. Prior to the summer of 1969, notwithstanding an episode of "anthracnose" for a week or two in the spring of 1968, the sycamore was healthy with heavy foliage and gave considerable shade to the plaintiffs' residence. The condition of the tree changed dramatically in the summer of 1969. The foliage became sparse, the leaves small and curled up at the edges, and "one side of the tree had hardly any leaves on it at all." By the time of trial, March 1970, some branches were either dead or dying and there was doubt if the tree would survive.

The best explanation offered at trial for the change in the tree's condition came from the testimony of plaintiffs' expert witness, Tom Harrison, Oregon State Spray Supervisor and Chemical Applicator

Supervisor for the Oregon State Department of Agriculture, who held a degree in the science of agronomy. Harrison had examined samples of the tree's twigs and leaves in the summer of 1969 and had personally examined the tree in October 1969 and again at the time of trial. He testified that the condition was caused by a "massive dose" of growth regulator herbicide absorbed through the tree's root system. This diagnosis was not contradicted during the trial.

The main question at the time of trial was how such an enormous quantity of the herbicide was found in the tree. The plaintiffs contend the herbicide's presence in the tree evidenced trespass by defendants, such trespass being defined in ORS 105.810, the relevant parts of which are as follows:

> "* * * [W]henever any person, without lawful authority, wilfully injures or severs from the land of another * * * or cuts down, girdles *or otherwise injures* * * * any tree, timber or shrub on the land of another person * * * if judgment is given for the plaintiff, it shall be given for treble the amount of damages * * * assessed for the trespass * * *." (Emphasis added.)

There was no direct evidence offered of the identity of the alleged trespasser or of the trespass itself. The case against defendants consisted of circumstantial evidence.

Other evidence presented, when viewed in a light most favorable to the plaintiffs, disclosed further that the presence of this sycamore tree near the parties' common boundary had been a source of friction between them since they became neighbors in July 1967, and that while plaintiffs valued the tree for the shade to cool their home in the summer and to protect their

flowers, the sycamore's umbrage was an annoyance to the defendants in that it impeded improvements they planned for their yard, including the cultivating of a new lawn, in which they took considerable pride. When the tree shed its leaves onto the defendants' plants and flowers, it caused them considerable concern. Testimony of a neighbor regarding a conversation with Mrs. Johnston developed the following:

"Q  What was the conversation?

"A  Well, I was sweeping out the carport and we were talking about a lot of clean-up work and I have a lot of trees around my house and she wanted to know if it wasn't a lot of work and I said, 'Yes, but I enjoy them all.' We just exchanged conversation. She talked about the leaves falling and all the work there was to clean them up. She just turned and said, 'I will kill that damned thing if it is the last thing I do.'

"Q  Which tree was she pointing to or— —

"A  Well, she wasn't pointing. She just turned like this (indicating) to the tree.

"Q  To the sycamore tree?

"A  Right."

Also, there was testimony that, in the spring of 1968, the defendants were seen working in a small excavation at the base of the sycamore tree while the plaintiffs were away on vacation. Near the excavation site was a large can. This excavation, although on defendants' property, was at the immediate base of the sycamore tree. The expert, Harrison, testified that the only other plants on plaintiffs' property showing any signs of herbicide poisoning were those near the trunk of the sycamore tree. There was also evidence that in March 1969 the defendants purchased and used a lawn product called "Scott's Turf Builder plus 4." Harrison testified the tree could not have been damaged, as evidenced by

the product, if it had been applied to defendants' lawn as directed. It was uncontroverted, however, that this product contained a herbicide which could, if used in sufficient quantity, produce the damage observed in the tree.

We hold that this evidence was sufficient to require the court to submit the case to the jury. The court did not err in denying defendants' motion for a directed verdict.

■ Defendants also assign as error the court's overruling of their objection to the admission of evidence that defendants cut down a maple tree on plaintiffs' property in 1967. Their sole contention is that the evidence was irrelevant. It is clear, from the record, that the evidence was admitted to show the defendants' "state of mind." The defendants contend that this evidence would show only defendants' state of mind on the collateral matter of cutting down the maple tree.

We do not agree. This action was brought and tried pursuant to ORS 105.810, which required plaintiffs to prove not merely that defendants injured the tree, but that the injury was "wilful." "Wilfully" is synonymous with "knowingly." *Siuslaw Timber Co. v. Russell*, 91 Or 6, 9, 178 P 214 (1919). *See also, Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 293 P2d 717 (1956); *State v. Nease*, 46 Or 433, 80 P 897 (1905). Thus, it was incumbent upon plaintiffs to prove either that defendants acted purposely to injure the tree or that, short of having such a narrow purpose, the defendants' conduct was such that they knew the tree would be injured as a result of their acts. The general rule is stated in 29 Am Jur 2d 414, *Evidence* § 365:

> "When one's motive, intention, malice or ill will, good or bad faith, or other state of mind, in doing

or omitting to do certain acts becomes an issue in a civil action, his acts, statements, and conduct on other occasions which which [sic] have a bearing upon his state of mind upon the occasion in question are relevant and competent evidence * * *."

The rule in criminal cases which allows evidence of prior similar acts is equally applicable in civil cases under appropriate circumstances. *See Union Central Life Ins. Co. v. Kerron*, 128 Or 70, 264 P 453 (1928); McCormick, *Evidence* § 164 at 345-46; II Wigmore, *Evidence* (3d ed) § 371 at 300; 32 CJS 707, *Evidence* § 580. The following quotation is from Wigmore, *supra*:

"The foregoing principles [i.e., the rules governing the admissibility of other offenses or similar acts, as evidence of knowledge, design, or intent] are equally as applicable to civil cases as to criminal cases * * *. This question [as to whether and under what conditions other similar acts are receivable to show knowledge, intent, or design as to the act charged] is of much less frequent occurrence in *civil* cases than in criminal cases, mainly because the issues of intent and the like are less commonly open in civil cases. *But wherever Knowledge or Intent or Design is relevant in a civil case the foregoing principles are equally applicable * * *."* (Emphasis added.)

The law of evidence in Oregon generally applies to both civil and criminal proceedings. ORS 136.150; Warner, *A Brief of the Criminal Cases in the Supreme Court for the Year 1924*, 4 Or L Rev 126, 131 (1925). In actions under trespass statutes, such as ORS 105.810, evidence is ordinarily admissible when it tends to show the motive and intent with which the act was done. 87 CJS 1095, *Trespass* § 134.

In criminal cases, this court has held that evi-

dence of prior acts or conduct of the defendant, even
if wrongful, are admissible if they tend to establish
criminal intent, an element of the crime charged. *See*
*State v. Guerrero*, 243 Or 616, 415 P2d 28 (1966) (to
show motive) ; *State v. Schell*, 224 Or 321, 356 P2d 155
(1960) (to show lust, intent, etc.) ; *State v. Justice*, 157
Or 597, 71 P2d 798 (1937) (to show intent and identity
of the defendant).

The admission of the evidence to which this assign-
ment of error refers is not error.

■ Defendants' next assignment of error is that the
court erred in instructing the jury to the effect that
there was liability, both absolute and statutory, if
the jury found any injury to plaintiffs' sycamore tree
by use of chemicals on defendants' own land.

The record in the case clearly indicates that
both counsel and the court narrowed the trial of the
case down to one of trespass, under ORS 105.810,
through the alleged application of a chemical to the
root system of the sycamore tree.

"THE COURT: * * * Their theory is one of
injury by use of chemical.

"MR. WINSTON: Yes, I agree with that * * *."

We have carefully examined the court's instructions
and, although that portion pertaining to trespass and
damages is quite lengthy, we fail to find any language
to imply there was absolute liability.

This is clearly a case of intentional injury to
plaintiffs' sycamore tree. The plaintiffs' complaint
alleges that "the defendants knowingly and wilfully
and without lawful authority and without the consent
of plaintiffs, entered onto the above described land
and wilfully injured a 30" in diameter Sycamore tree
growing thereon, all to plaintiffs' damage in the sum

of $3000.00." The defendants answered by filing a general denial. This is the theory the case was tried on.

As stated, the expert witness, Harrison, testified that the condition of the tree was caused by a "massive dose" of growth regulator herbicide absorbed through the tree's root system and there is no evidence to contradict this. Some samples of twigs and leaves were first forwarded to Harrison for inspection. He testified as follows:

"Q And what did you observe from the samples that you received from Mr. Brown?

"A I observed that it was very typical symptoms of a growth regulator herbicide.

"Q What are these symptoms?

"A The symptoms are you have a rolling of the margins of the leaves; the leaves will cup up; the veinal ends, the terminals of the veins will protrude beyond the apex of the margin of the leaves. You will have on some cases where the tissue growth is malformed; you will have the veins running together causing a general distorted growth of the tissue itself.

"Q Did you find all these symptoms in the twigs and leaves you received from the Browns?

"A Yes."

Harrison subsequently examined the tree and its surroundings and testified that the damage to the tree could not be caused through normal spraying for dandelions or weeds and that it would take an appreciable amount of growth regulator herbicide applied in the soil to cause the damage to the tree. On cross examination of Mr. Harrison, there was testimony as follows:

"Q * * * [A]re you saying that, in your opinion, the tree has received this product, what-

ever it might be, as the result of some localized dumping of material or. spillage, * * *?

"A If the tree roots would come in contact with the chemical, then it would.absorb it and it would be translocated throughout the tree, generally. Wherever that location might be, I don't know—anywhere the roots would come in contact with it.

"* * * * *

"A * * * On most of the deciduous trees you would get a killing of one side of the tree more than the other. This would give you a reasonable idea on where the herbicide would be in the soil. It would not be a definite one."

At the conclusion, the court instructed the jury they would have three verdict forms. Each form was read to the jury. If the trial court's instructions can be construed to instruct the jury that they could find the defendants liable upon the theory of absolute liability, the instructions would be in error. Such error, however, would not be prejudicial because the jury returned the form of verdict which provided that the defendants committed a willful and intentional trespass. We find no error, as claimed by defendants, in this assignment.

■ Defendants' last assignment of error is that the court erroneously granted judgment for treble damages. The jury returned a verdict for $1,000, based on the testimony as to value of the property both before and after the alleged injury. The court entered judgment for $3,000 and costs.

The attorneys and the court discussed the forms of verdict to be submitted to the jury and whether the jury or the court should assess the treble damages, in the event of a verdict in favor of plaintiffs, pursuant to ORS 105.810.

"THE COURT: * * * [M]y question is whether the jury does it or whether we do it in the form of the judgment.

"MR. ANDERSON: You do it in the form of the judgment.

"MR. WINSTON: That is my understanding of the law.

"THE COURT: If you have no quarrel with it. Then I will do it that way * * *."

Examination of the record in the case, including the defendants' motion for judgment notwithstanding the verdict, discloses that no objection was made that the court erroneously granted judgment for treble damages. This was not brought to the attention of the trial judge and defendants cannot raise this contention upon appeal.

The judgment is affirmed.