Argued 15 January, decided 5 February, 1907.

**STATE v. AYERS.**

88 Pac. 653.

CRIMINAL LAW—REFERENCE TO COMMON LAW FOR DEFINITION.

1. Although there are no common law offenses in Oregon, the common law is still the source from which we draw the definitions of many offenses denounced by the code, and reference may properly be made thereto for that purpose.

DEGREE OF DEPRAVITY EVIDENCED BY POOL SELLING.

2. The selling for gain of pools upon horses which are to compete in public speed contests on a track is an act which "grossly" disturbs the public peace and welfare, and "openly" outrages public decency, within the meaning of those terms as used in Section 1930, B. & C. Comp.

POOL SELLING ON PRIVATE RACE TRACK AS A PUBLIC NUISANCE.

3. The sale of pools at the race course of a private corporation, but where the general public assembles, constitutes nevertheless a public nuisance, and is subject to the punishment imposed by Section 1930, B. & C. Comp.

GAMING—KEEPING HOUSE FOR SELLING POOLS—CRIMINAL OFFENSE.

4. The keeping of a house for selling pools on horse racing is not an offense punishable under Chapter 50, Deady's Gen. Laws, relating to the playing of games by gambling devices, since the winner is not determined by the manipulation of any device. The ticket issued by the seller cannot be considered a device influencing the result.

POOL SELLING—CONCURRENT AND EXCLUSIVE JURISDICTION OF MUNICIPAL CORPORATIONS AND THE STATE.

5. Where a municipality is given jurisdiction over a misdemeanor already punishable under a state law, the jurisdiction will be construed to be concurrent, unless the contrary clearly appears to have been intended.

For example: Section 1930, B. & C. Comp., prohibiting the selling of pools on horse races, as gambling, is not affected by Section 72 and Section 73, subd. 49, of the Charter of Portland of 1903, authorizing the prevention and punishment of gambling houses, there being no words of exclusion or restriction as to the state offense.

From Multnomah: ARTHUR L. FRAZER, Judge.

William M. Ayers appeals from a judgment of conviction for pool selling.                                    AFFIRMED.

For appellant.there were oral arguments by *Mr. Martin Luther Pipes* and *Mr. Samuel Bruce Huston*, with a brief over the names of *Mr. Pipes, Mr. Huston, Mr. W. L. Boise* and *Mr. J. T. McKee*, to this effect:

We submit these propositions to be true: (1) The legislature only, and not the courts, can define crime and provide its punishment; and (2) The act prohibited by the law-making power must be defined with reasonable certainty so a reasonably intelligent person may understand what act is prohibited. In Oregon there are no common-law crimes, and every criminal statute must within itself define the prohibited act (*State* v. *Mann,* 2 Or. 238), which must inevitably be the rule where the legislative and judicial branches of government are separate, as in the United States. This is the distinguishing characteristic of the American form of government. The English judges did not hesitate to entirely create new crimes, and they defined a crime if they thought some act ought to be punished though not denounced by any existing statute. Applying this limitation specifically it will appear that Section 1930, B. & C. Comp., prohibits most everything that a trial judge may happen to consider misconduct. The results of the acts prohibited are as extensive as the domain of human conduct, it being evidently the intention of the legislature to make the courts the residuary legatees of the balance of its power to punish crime, and to invest them with jurisdiction to define and punish any act overlooked in the category of crime. It meant in the unoccupied field to vest the judges in Oregon with the power of the English judges.

Another construction has been given this section in the Nease Case in 46 Or. 433, where it held that it was intended to punish nuisances as defined by the common law. We submit that at common law there was no definite description of a nuisance, as the acts constituting that offense are of infinite variety. This

source of information is no more certain than the statute; to send the citizen to the common law to find what acts this statute prohibits is to turn him loose in a wilderness of judicial decisions to find what the legislature should itself have specified. If there are no crimes except those defined by statute, then the definitions must be there and not in the unwritten law or judicial decisions of England. The legislature has not given authority to go elsewhere for definitions, and we submit that no authority can come from any other source, and without distinct authority so to do the courts should not undertake to supply a definition that the legislature omitted to make. The court in the Nease Case went, without any authority, to the ancient and unwritten law of another country to find whether the judges there had prohibited the keeping of pool rooms, and then incorporated what was found into our statute. Our legislature has not, either directly or impliedly, prohibited keeping pool rooms; only this court has done that.

But this is not and never was a nuisance statute, and this court erred in so holding in the Nease Case for two reasons: The section includes acts that never were indictable nuisances, only those being indictable that affected the public welfare, and the offense is not defined. Authority to define crimes and to designate what acts shall be punishable as crimes cannot be delegated: 6 Am. & Eng. Enc. Law (2 ed.), 1028; *State* v. *Gasler,* 45 La. Ann. 636; *Montross* v. *State,* 61 Miss. 429; *State* v. *Gaunt,* 13 Or. 115 (9 Pac. 55).

A comparison of the statutes on this subject will show that the legislature did not mean to include pool selling under this dragnet section.

If the act of pool selling ever was prohibited, the statute has been repealed by implication by the granting to the City of Portland of the powers enumerated in Sections 72 and 73 of the Charter of 1903. Where a city is given exclusive power to punish gaming it has the effect of repealing the state law: 14 Am. & Eng. Enc. Law (2 ed.), 695; *Rogers* v. *People,* 9 Colo. 450 (59 Am. Rep. 146: 12 Pac. 843); *State* v. *Gordon,* 60 Mo. 383.

For the State there was an oral argument by *Mr. Bert Emory Haney,* with a brief over the names of *A. M. Crawford,* Attorney General, *John Manning,* District Attorney, and *Mr. Haney,* to this effect:

Section 1930, B. & C. Comp., is a re-enactment of the common law on the subject of public nuisances as to health, peace and morals. Whatever, therefore, could be punished at common law, because it tended to grossly disturb the public peace or health, or to openly outrage public decency or to injure public morals, can be punished under our statute: Endlich, Interp. Stat. §§ 3 and 75; Sutherland, Stat. Const. §§ 247-253; *State v. Nease,* 46 Or. 433 (80 Pac. 897) ; *State v. Bertheol,* 6 Blackf. 474 (39 Am. Dec. 442) ; *Burk v. State,* 27 Ind. 430; *State v. Taylor,* 29 Ind. 517; *State v. Birdetta,* 73 Ind. 185 (38 Am. Rep. 117) ; *Western Union Tel. Co.* v. *Scircle,* 103 Ind. 227 (2 N. E. 604) ; *United States v. Jones,* 3 Wash. (C. C.), 209.

We submit that, while there are no common-law offenses in Oregon, it is quite proper to go to the common law for definitions of crimes denounced by our statutes. The decision in the Nease Case so holds, and we do not admit for a moment that it was judge-made law rather than legislative law. To cite a case in point, we have a statute forbidding and punishing an assault, being armed with a dangerous weapon, and on many occasions this court has declared that different articles were dangerous weapons—articles that are ordinarily used for peaceable uses. Even counsel for appellant will not claim those rulings to be judge-made law. What is the difference between those cases and this one? We submit, none!

Maintaining a place for the sale of pools on horse races, where large numbers of persons (alleged in this case to be "many thousands, of all classes,") congregate to bet on horse races, constitutes a public nuisance under all rulings everywhere: *State v. Nease,* 46 Or. 433 (80 Pac. 897) ; *Vanderworker* v. *State,* 13 Ark. 700; *Thatcher* v. *State,* 48 Ark. 60 (2 S. W. 343) ; *Lord* v. *State,* 16 N. H. 325-330 (41 Am. Dec. 729) ; *Thrower* v. *State,* 117 Ga. 753 (45 S. E. 126) ; *People* v. *Jackson,*

3 Denio, 101; *King* v. *People,* 83 N. Y. 587; *State* v. *Mosby,* 53 Mo. App. 571; McClain, Crim. Law, § 1169; 2 Roscoe, Crim. Ev. § 1029.

The charter of the City of Portland has not repealed the state law against gambling: McClain, Crim. Law, § 1306; 14 Am. & Eng. Enc. Law (2 ed.), 695; *Berry* v. *People,* 36 Ill. 429; *State* v. *Caldwell,* 3 La. 435; *Odell* v. *City of Atlanta,* 97 Ga. 670 (25 S. E. 173); *Schuster* v. *State,* 48 Ala. 199; Const. Or. Art. XV, § 4; *State* v. *Burchard,* 2 Or. 80; *Sandys* v. *Williams,* 46 Or. 327 (80 Pac. 642); *State* v. *Nease,* 46 Or. 433 (80 Pac. 897).

The defendant's construction of Section 72 of the Portland charter is wrong; the word "exclusively" therein refers to the exercise of legislative authority by the council as distinguished from other city officials. The section means that no legislative authority shall be exercised for or on behalf of the city except by the common council, and such a grant as that will at most confer only concurrent jurisdiction over the offenses enumerated. There is no repeal in such cases unless it is clear that the legislature meant to grant exclusive jurisdiction to the city, which is not the case here.

Mr. Justice Moore delivered the opinion of the court.

The defendant, William M. Ayers, was accused by an information of the crime of wilfully committing an act which grossly disturbed the public peace, openly outraged public decency, and injured the public morals, alleged to have been perpetrated in Multnomah County, August 4, 1905, and prior thereto, by habitually selling for gain pools upon horses at an exhibition trial of their speed on a race track, particularly describing the place and the method pursued, and that he there, and on the day mentioned, sold a ticket upon a certain horse to one Victor Lindback, receiving therefor the sum of $20, to the common nuisance of all good citizens, and contrary to the statutes, etc. A demurrer to the information, on the ground that it did not state facts sufficient to constitute an offense against the laws

49 Or.——5

of Oregon, having been overruled, a plea of not guilty was interposed, whereupon the defendant stipulated that the facts stated in the information were true and submitted the cause to the court, without the intervention of a jury, to determine whether or not he was guilty as charged, and, having been convicted thereof, he appeals from the judgment which followed.

1. The finding of his guilt conforms to the decision rendered in the case of *State* v. *Nease,* 46 Or. 433 (80 Pac. 897), and is based on an alleged violation of the following statute, to wit:

"If any person shall wilfully and wrongfully commit any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages the public decency and is injurious to public morals, such person, if no punishment is expressly prescribed therefor by this code, upon conviction thereof, shall be punished," etc.: B. & C. Comp. § 1930.

It is contended by defendant's counsel that, as this section neither names any offense at common law, so that reference might be had thereto for a more specific description, nor specifies any particular act that is denounced as a crime, an error was committed in observing the rule adopted in the case mentioned. As no common-law offenses are recognized in this state (*State* v. *Vowels,* 4 Or. 324; *State* v. *Gaunt,* 13 Or. 115: 9 Pac. 55; *State* v. *Nease,* 46 Or. 433: 80 Pac. 897), it is necessary for the legislative assembly by statute to specify crimes and to prescribe punishments therefor, in order to make their enactments enforceable. In *Hackney* v. *State,* 8 Ind. 494, decided in 1856, it was held that there were not then in Indiana any common-law offenses, the court remarking: "We cannot look to the common law for the definition of a nuisance or any other crime," but that decision was evidently rendered after the passage of an act requiring all offenses committed in that state·to be defined by statute (*Burk* v. *State,* 27 Ind. 430), for prior thereto the rule had been that reference might be had to the ancient law to ascertain of what facts the crime of nuisance consisted: *State* v. *Bertheol,* 6 Blackf. 474 (39 Am. Dec. 442). Lord Coke, in discussing the principles of the common law and describing a

species of crime cognizable thereat, says: "Murder is when a man of sound memory, and of the age of discretion, unlawfully killeth within any county of the realm any reasonable creature in *rerum natura* under the king's peace, with malice forethought, either expressed by the party, or implied by law, so as the party wounded, or hurt, etc., die of the wound, or hurt, etc., within a year and a day after the same": 3 Coke's Institutes, 47.

If our statute, embodying parts of Sections 1741 and 1751, B. & C. Comp., had delineated the commission of an offense and prescribed a punishment as follows: "If any person shall purposely, and of deliberate and premeditated malice, kill another, such person, upon conviction thereof, shall be punished with death," the elements of the common law could undoubtedly be examined to ascertain the name anciently given to the classification of such crime: *State* v. *DeWolfe,* 67 Neb. 321 (93 N. W. 746). In the case last cited, the defendant was charged with maintaining a nuisance by unlawfully exposing the citizens of a village to a contagious disease in negligently keeping an infected person in a public place. A demurrer to the information having been sustained on the ground that the Code of Nebraska particularly sets forth the conduct which constitutes a nuisance and provides a penalty therefor, but did not include the acts complained of, the action was dismissed and the state appealed. In reversing the judgment, Mr. Chief Justice SULLIVAN says: "In this state all public offenses are statutory, no act is criminal unless the legislature has in express terms declared it to be so, and no person can be punished for any act or omission which is not made penal by the plain import of the written law. * * But, while there are in this state no common-law crimes, the definition of an act which is forbidden by the statute, but not defined by it, may be ascertained by reference to the common law." See, also, *Smith* v. *State,* 12 Ohio St. 466 (80 Am. Dec. 355); *Prindle* v. *State,* 31 Tex. Cr. R. 551 (21 S. W. 360: 37 Am. St. Rep. 833). In the case at bar, the character of the act which constitutes the offense is stated in the statute, and, though the enactment does not define

the crime, it specifies the facts which evidence the commission thereof.

2. It is argued, however, that the only human conduct thus denounced is such as, in the opinion of the courts, might seem "grossly" to injure the person or property of another, or "grossly" to disturb the public peace, or "openly" to outrage public decency, thereby necessitating a resort to the principles of the common law to determine whether or not any particular act comes within the prohibition, when recourse should only be had to a statute which clearly defines the behavior inveighed against. Our statute makes it a crime for any person, being armed with a dangerous weapon, to assault another with such instrument (B. & C. Comp. § 1771), without in any manner attempting to define the weapon. "Some weapons under particular circumstances," says Mr. Justice STRAHAN in *State* v. *Godfrey,* 17 Or. 300 (20 Pac. 625 : 11 Am. St. Rep. 830), "are so clearly lethal that the court may declare them to be such as a matter of law." The rule by which the conclusion is deduced that an instrument which, when violently used, is ordinarily capable of producing death or great bodily harm, and therefore dangerous, is derived from the common law. As this principle is based on the degree of harm that is commonly incident to the impetuous use of a weapon, and can be invoked when occasion demands its exercise, a court, upon principle, ought to be equally as competent to determine what acts of a person "grossly" injure, etc., or "openly" outrage the public decency. In *State* v. *Nease,* 46 Or. 433 (80 Pac. 897), Mr. Justice BEAN portrays the mischievous consequences that attend the keeping of a gaming house for the sale of pools on horses at races, and shows the evil effect of the dealing upon the persons who visit these gambling places or witness the operations conducted thereat, and, in view of such pernicious result, we entertain no doubt that the offense which the defendant stipulated that he committed comes, as a matter of law, within the degree of "grossly" outraging public decency and also injuring public morals.

3. The sale of pools by the defendant is alleged to have been

at the course of the Multnomah Fair Association, a corporation, where, on the day named, were assembled many thousands of people to witness the racing of horses. That the offense charged was the commission of a public nuisance, affecting the general welfare, and therefore subject to the punishment imposed by Section 1930, B. & C. Comp., is, in our opinion, unquestioned, and whether or not the statute may have been intended to include private nuisances, which were not recognized as crimes at common law, is not deemed necessary to a decision herein.

4. It is insisted by defendant's counsel that the section under consideration does not include the keeping of houses for selling pools on horse racing, because another part of the code, adopted at the same time, prescribes a punishment for such conduct. The section mentioned was passed October 19, 1864, appears in the General Laws of Oregon, 1845-1864, and is compiled and annotated by M. P. Deady as Section 659 of Chapter 49. The next chapter of that compilation, the other part of the code referred to, embraces Sections 666 and 681, inclusive, which relate to the playing of games, etc., by gambling devices for money, property or any representation thereof. In the brief of defendant's counsel on this branch of the case, the following statement is found: "And there can be no doubt that pool selling, as set out in the indictment, uses a device." A gambling device is any contrivance by the operation of which chances are determined whereby money or property is lost or won: *Portis* v. *State,* 27 Ark. 360; *In re Lee Tong* (D. C.), 18 Fed. 253; *State* v. *Herryford,* 19 Mo. 377. The keeping of a place for the sale of pools on horses by which money or property is staked on the result of a race is the maintenance of a gambling house: *Swigart* v. *People,* 50 Ill. App. 181; *Edwards* v. *State,* 76 Tenn. (8 Lea), 411. In such case, however, the chance upon which the wager is made and the money or property placed is the competitive speed of a particular horse that has been selected as the possible winner, and not upon the manipulation of any device. The ticket which the defendant is charged with having sold was undoubtedly designed to evidence a contract,

but from the manner of its use, we do not think it can be classed as a gambling device, and hence conclude that the selling of pools on horse races was not included in Chapter 50 of the compilation mentioned.

5. It is also maintained by defendant's counsel that, if Section 1930, B. & C. Comp., ever prohibited the selling of pools on horse races, the statute in this respect was repealed by the adoption of the charter of the City of Portland, within the limits of which the act complained of occurred. The clauses of the action of incorporation thus relied upon are Section 72, which confers upon the council exclusive legislative power, etc., and subdivision 49 of Section 73, which authorizes the prevention and punishment of gaming and gambling houses: Sp. Laws 1903, pp. 3, 26 and 3, 33. It will be remembered that the defendant stipulated that he committed the act charged in the information as therein alleged. The following averment is contained in the written accusation, to wit:

"That the said race track is situated about two miles from the courthouse in the said City of Portland, and is in the suburbs of the said city."

Whether or not the race track mentioned is within the limits of the municipality is not clearly disclosed by the information, but, as counsel for the respective parties have so treated it, we shall assume the course is within the boundaries thereof. "The legislature," says Mr. Justice Wagner, in *State* v. *Gordon,* 60 Mo. 363, "has the undoubted right, in reference to statutory misdemeanors, to say in what particular jurisdiction they shall be tried, and to make that jurisdiction exclusive of all others. When the power to hear and determine these minor offenses is given to a municipal corporation, but no words of exclusion or restriction are used, the remedies between the state and the corporation will be construed to be concurrent, but where the manifest intention is that the prosecution shall be limited exclusively to one jurisdiction, that intention must prevail." To the same effect, see, also, 14 Am. & Eng. Enc. Law (2 ed.), 695; *State* v. *Haines,* 35 Or. 379 (58 Pac. 39: 2 Munic. Corp. Cas. 430);

*Rogers* v. *People,* 9 Colo. 450 (12 Pac. 843 : 59 Am. Rep. 146) ; *Berry* v. *People,* 36 Ill. 423.

The charter of the City of Portland does not purport to confer exclusive jurisdiction to prevent gambling houses, and, as the crime of gaming was recognized at common law (4 Blackstone's Commentaries, *171), the circuit court had jurisdiction of the case at bar, and the judgment rendered therein is affirmed.                                                    AFFIRMED.

---

Decided 26 February, 1907.