Argued June 9; affirmed July 19, 1932

# MULTNOMAH COUNTY FAIR ASSOCIATION *v.*
# LANGLEY, DISTRICT ATTORNEY, ET AL.

### (13 P. (2d) 354)

*E. B. Seabrook* and *W. W. Banks,* both of Portland (Seabrook & Seabrook, of Portland, on the brief), for appellant.

*Lotus L. Langley,* District Attorney, and *Ben H. Conn,* Deputy District Attorney, both of Portland (George Mowry, Deputy District Attorney, of Portland, on the brief), for respondents.

ROSSMAN, J. The complaint alleges that in the conduct of horse races the plaintiff has adopted the plan which we shall now describe. Upon the entry of a horse in any race its owner is required to assign to the plaintiff all of its earnings by way of purse, prize or premium. In consideration of the assignment the plaintiff guarantees payment to the owner of a certain sum as a reward. The complaint alleges:

"In order to obtain the necessary money to pay the expenses of such race, plaintiff, its lessee or agents, will solicit subscriptions for the purpose of defraying said expenses and of providing purses and premiums to be earned by said horses. All of said subscriptions will be used as follows: (1) In payment of the cost and expense of the race; (2) all of the remainder of said subscription shall constitute purses and premiums to be awarded to the three horses which finish said race in first, second and third positions. In order to induce

subscriptions for the purposes aforesaid, plaintiff or its lessee or agents, gives to each subscriber a proportion of the said earnings of any horse the subscriber may select. This is a mere gratuity. The understanding is that when a subscriber makes a subscription his subscription is parted with and no part of the same is returned to him as a matter of right. It is to be used for expenses and purses of the race. In the event that plaintiff, or its lessee or agents, acquire any earnings by virtue of the assignment thereof by the owners or legal possessors of the horses, they may or may not, as they decide, give to the subscribers a proportion thereof. The promise of this gift is an inducement to obtain subscriptions, but the plaintiff has kept and intends in good faith to keep said promise and distribute the excess of subscriptions over expenses and purses among the subscribers. All details of distribution are left to the plaintiff. Subscriptions are received in amounts of $2.00 or $5.00 or $10.00 each, and the distribution of the excess subscriptions are made in proportion to the subscriptions received.''

Continuing, the complaint alleges that the subscriptions were received in a building ''fitted with booths, at which booths the subscriptions were received and receipts therefor issued, adjacent to the race track.''

The complaint alleges that the defendants, who are the district attorney and sheriff of Multnomah county, contend that the above manner of conducting the horse races violates § 14-722 and § 14-801, Oregon Code 1930. § 14-722, Oregon Code 1930, provides:

''If any person shall wilfully and wrongfully commit any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages public decency and is injurious to public morals, such person, if no punishment is expressly prescribed therefor by this Code, upon conviction thereof, shall be punished

by imprisonment in the county jail not less than one month nor more than six months, or by fine not less than $50.00 nor more than $200.00.''

Section 14-801, Oregon Code 1930, provides:

''If any person shall promote or set up any lottery for money or other valuable thing, or shall dispose of any property of value, real or personal, by way or means of lottery, or shall aid or be in any way concerned in setting up, managing or drawing such lottery  *  *  *  such person, upon conviction thereof shall be punished by imprisonment in the penitentiary not less than six months nor more than one year, or by imprisonment in the county jail not less than three months nor more than one year, or by fine not less than $100.00 nor more than $1,000.00.''

Article XV, section 4, Constitution of Oregon (Oregon Code 1930, page 195) provides:

''Lotteries, and the sale of lottery tickets for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws.''

■■ The parties are agreed that §§ 14-722 and 14-801, Oregon Code 1930, are the only provisions of our statutes which are applicable to the conduct described in the complaint. There are no common law crimes in this state: *State v. Nease,* 46 Or. 433 (80 P. 897) ; *State v. Gaunt,* 13 Or. 115 (9 P. 55) ; *State v. Vowels,* 4 Or. 324. However, the common law may be resorted to as a source of information for determining the elements of some specific crime condemned by a statute in general words: *Barnett v. Phelps,* 97 Or. 242 (191 P. 502, 11 A. L. R. 663) ; *State v. Waymire,* 52 Or. 281 (97 P. 46, 21 L. R. A. (N. S.) 56, 132 Am. St. Rep. 699) ; *State v. Ayers,* 49 Or. 61 (88 P. 653, 10 L. R. A. (N.S.) 992, 124 Am. St. Rep. 1036) ; and *State v. Nease,* supra. By the employment of this principle of statutory construction it has become established that § 14-722 was intended

"to cover offenses against the public peace, the public health and the public morals, not elsewhere made punishable by the Code, and which were known at common law as 'indictable nuisances.' " *State v. Waymire, supra.* See also *Barnett v. Phelps, supra.* The maintenance of a pool room in which persons congregate to bet upon horse races is a gaming house punishable as a nuisance at common law, and, therefore, prohibited by § 14-722: *State v. Ayers, supra,* and *State v. Nease, supra.* The problem for solution, therefore, is whether the manner in which the plaintiff intends to conduct horse racing, as described in its complaint, is a lawful activity or constitutes a lottery or a nuisance.

It will be observed from the complaint that the plaintiff solicits contributions of $2, $5 and $10 from interested persons and that it uses the sum obtained for the following purposes: (1) To offer prizes to owners of horses as inducements for the entry of their horses in the races; (2) to discharge the expenses attendant upon the races; and (3) to create a fund for distribution among those contributors who, at the time when making their contributions, select a horse which wins first, second or third place in the race.

The district attorney does not argue that the owner's conduct in racing his horse for the premium is an unlawful act, but contends that the conduct of the plaintiff in soliciting contributions and distributing the surplus among those who select the three winning horses violates the legislative act proscribing lotteries or common law nuisances. The plaintiff argues that its conduct is lawful. It argues: (1) That the outcome of a race is not dependent upon chance; (2) that when a contributor makes a selection among the horses his choice is the result of judgment, based upon information, and that, therefore, the subsequent distribution

of the surplus among the contributors is not a lottery; (3) that the contribution is not a wager or a bet and, therefore, does not constitute gaming; (4) that the plaintiff and the contributors are joint adventurers in the conduct of the race; (5) that certainty of a stake in betting is an essential element in gaming and that since it cannot be known when many if not all of the contributors make their payments that there will be a surplus, this essential element in gaming is absent; (6) that the act of the contributors amounts to nothing more than providing a premium for the races; (7) that in order to constitute a bet there must be two parties, one of whom will eventually become the winner and the other the loser; and (8) that the two parties to this transaction are the plaintiff and the contributors, and that since the plaintiff can neither be a loser nor a winner in the transaction the above essential element is. absent.

It is evident that whether a contributor will receive a return after the race has been run is subject to some contingencies the outcome of which he cannot predict by the exercise of judgment. For instance, whether a surplus available for distribution will exist after the race has been run is dependent upon whether sufficient contributions have been obtained to leave an excess after prize money has been provided and the expenses of the race have been discharged. It will also be observed that the surplus is not distributed among all of the contributors, but only among those who selected the horses which won first, second and third place in the race. We believe that an inference can fairly be drawn from the allegations of the complaint that the contributors who selected the horse which won first place will receive a larger return, if any is paid, than the contributors who selected the

horse which finished in second place, and the latter group will receive a larger return than the group who selected the third horse. To the many who possess a propensity for gambling, the opportunity provided by the above scheme for obtaining a larger sum upon the hazarding of a smaller one would prove peculiarly alluring; in fact, we believe the conclusion is justifiable that the scheme was especially devised to appeal to this propensity. The scheme makes ample provision for surprises, so that the winner can praise his good judgment when he draws down a liberal return, and curse his luck when he loses. For instance, if every contributor selected the horse which won first place the return to the contributors could not equal their original contributions. Therefore, all would lose. But if only one selected the horse which won first place, and, likewise, if only one each selected the horses which won second and third place, the return would far exceed the original contributions of those three persons, if the surplus was large.

We find, therefore, in this scheme a feature well adapted to appeal to that element of society which possesses the gambling instinct. If the plaintiff did not intend to introduce into its plan a provision which would lure those possessed of a propensity for gambling it would distribute the surplus among all contributors. The building where the contributions are received and the tickets of the winners cashed would, of necessity, become a congregating place for those hazarding sums of money upon the outcome of the races. The evils which in the past have been attendant upon pool rooms would assert themselves, partially at least, at that place. Betting sums upon horse races and the maintenance of pool rooms are commonly believed to be attended with many evils. Numerous de-

cisions point out that such activities encourage idleness, cause impoverishment and create breaches of the peace. It will be observed that this is not a proceeding against some individual who had made a contribution or entered his horse in a race, but is an effort upon the part of the plaintiff to have its scheme declared lawful. A reading of the descriptions recited in *State v. Ayers,* supra, and *State v. Nease,* supra, of the manner in which the pool rooms condemned in those decisions were conducted will readily disclose that the plaintiff's method contemplates an activity similar to those denounced therein. In the Ayers case this court said: "The keeping of a place for the sale of pools upon horses by which money or property is staked on the result of a race is the maintenance of a gambling house." In the Nease case this court said: "That such a house is a gaming or gambling house * * * has so often and uniformly been held by the courts that it is no longer open to discussion." In *People v. Reilly,* 50 Mich. 384 (15 N. W. 520, 45 Am. Rep. 47), the court, after describing the defendant's activities as consisting of pool selling upon horse races and baseball games, declared: "That this is a species of gambling is clear enough." The feature of the plaintiff's plan, essential to its success, is the provision for the creation of a pool to be distributed among a portion only of the contributors. We believe that the conclusion pronounced in the three decisions just reviewed is justified in the present case.

■ The problem remains, however, whether the elements of gambling forming a part of the plaintiff's scheme violated § 14-722 or § 14-801, Oregon Code 1930. We shall consider first the lottery statute, and it will be recalled that the circuit court was of the opinion that the plaintiff's plan violated that section of our

laws. In *Fleming v. Bills,* 3 Or. 286, this court quoted various definitions which point out that a lottery is a game of hazard in which small sums are ventured for the chance of obtaining greater. It also stated that "it seems essential to constitute a lottery that the scheme should not be a game of skill." In *National Thrift Ass'n v. Crews,* 116 Or. 352 (241 P. 72, 41 A. L. R. 1481), this court declared that "the essential elements of a lottery are (1) consideration; (2) prize; (3) chance." In a lottery skill, judgment and practice play only a subordinate part, and many authorities declare that they have no place in a lottery at all and are intended to be thwarted by the governing rule of chance so far as they exert themselves. We certainly are justified in saying that chance, as distinguished from skill, must be the predominant factor in a lottery. The authorities are collected in 38 C. J., Lotteries, p. 290, § 5. And see especially *People ex rel. v. Fallon,* 4 App. Div. (N. Y.) 82 (39 N. Y. S. 865), affirmed in 152 N. Y. 12 (46 N. E. 296, 37 L. R. A. 227, 57 Am. St. Rep. 492).

It has been held that pools and pool selling on horse races constitute the maintenance of a lottery. The two best holdings to that effect are *Tollett v. Thomas,* 6 L. R. Q. B. Cas. 514 and *Miller v. United States,* 6 App. D. C. 6. In the Tollett case Chief Justice Cockburn, who wrote the opinion, was influenced largely by the fact that the individual who wagered his bet upon the horse race which was being conducted under the pari-mutuel system, could not at the time when he made his bet know the amount which he would win. The chance that it might be large or small influenced the court into the belief that the result was so largely dependent upon chance that it held the scheme a lottery. In *State v. Lovell,* 39 N. J. Law 458,

the court held that auction pools, French pools and combination pools were lotteries within the prohibition of a New Jersey statute which provided: ''All lotteries for money, goods, wares, merchandise, chattels, lands, tenements, hereditaments or other matters or things whatsoever shall be and are hereby adjudged to be common and public nuisances.''

But well reasoned cases can readily be found which take the opposite view. In *Commonwealth v. Kentucky Jockey Club,* 238 Ky. 739 (38 S. W. (2d) 987), the court held that statutes of that state, under which the State Racing Commission had granted licenses to jockey clubs to hold races under the pari-mutuel system, did not conflict with the provision of the Kentucky constitution which provided: ''Lotteries and gift enterprises are forbidden. * * * The General Assembly shall enforce this section by proper penalties. * * *'' The court was of the opinion that ''gaming, betting and lotteries are separate and distinct things in law and fact'' and readily conceded that all of them were within the power of the legislature to prohibit, regulate or classify, but was of the opinion that when the Kentucky constitution was adopted ''it did not occur to anyone during that period that betting on races, elections or similar forms of wagering constituted a lottery.'' In *Utah State Fair Assn. v. Green,* 68 Utah 251 (249 P. 1016), the Supreme Court of that state, acting under the declaratory judgment statute, held that an act of that state which provided that ''bets or wagers under the cooperative or pari-mutual system of betting and wagering shall not be unlawful'' when the race was conducted under the supervision of the State Racing Commission, was not in conflict with the provision of the Utah constitution which provided:

"The legislature shall not authorize any game of chance, lottery or gift enterprise under any pretense or for any purpose." In arriving at its conclusion the court was persuaded by the fact that the outcome of a horse race is not dependent upon mere chance but upon other factors which are more or less manifest, and was also persuaded by the circumstance that when the above mentioned provision of the Utah constitution was being debated before the constitutional convention its proponent stated that it would not have the effect of prohibiting betting upon horse racing. Since various other decisions which have likewise held that betting upon horse races does not constitute a lottery are reviewed or cited in the aforementioned Utah and Missouri decisions, we shall not repeat the citations herein.

It will be recalled from the provisions of § 14-722, Oregon Code 1930, which prohibits common law nuisances that that section of our laws is applicable only if no other provision of our laws prescribes punishment for the conduct under investigation. We have already pointed out that in *State v. Ayers,* supra, and *State v. Nease,* supra, this court held that pool selling constitutes a common law nuisance within the prohibition of § 14-722, Oregon Code 1930. In *State v. Ayers,* the defendant sold his pools at the race course of the Multnomah County Fair Association where the races were being held. In *State v. Nease,* the defendant "was the keeper and proprietor of what is called 'turf exchange' or pool room on one of the principal thoroughfares in the city, at which persons daily congregated for the purpose of betting upon horse races run in other states and reported to him by telegraph. The odds on every horse in any race of importance about

to be run, as made at the race course, were reported to the defendant before the race, and posted for the information of the public on a blackboard in the room used by him. A person desiring to bet would select a horse, pay the amount of his bet according to the odds appearing on the blackboard, and receive from the defendant a ticket showing the sum to which he would be entitled in case the horse selected by him won. As soon as the race was run the result would be immediately telegraphed to the defendant, and he would pay the amount coming to the holders of tickets on the winning horse, less a certain per cent as commission.'' In *State v. Ayers,* this court rejected a contention that pool selling was a gambling game dependent upon the manipulation of devices of the character defined in § 14-739, Oregon Code 1930. The decision expressed itself thus: ''The keeping of a place for the sale of pools on horses by which money or property is staked on the result of a race is the maintenance of a gambling house: *Swigart v. People,* 50 Ill. App. 181; *Edwards v. State,* 76 Tenn. (8 Lea.) 411. In such case, however, the chance upon which the wager is made and the money or property placed is the competitive speed of a particular horse that has been selected as the possible winner, and not upon the manipulation of any device.''

In *State v. Nease,* this court declared ''that such a house is a gaming or gambling house, and punishable as a nuisance at common law, whether betting on a horse race is a crime or not, has so often and uniformly been held by the courts that it is not longer open to discussion. There is no dissent in the adjudged cases, and it is unnecessary to do more than cite the authorities. * * * The keeping of a gaming house was, therefore, an offense at common law because, among other things, it disturbed the public peace and

tranquillity by encouraging idleness, riot, thriftless-
ness, breaches of the peace, disorderly conduct and
the like.''

It will be seen from our review of the Ayers and
Nease cases that this court has rejected the contention
that the outcome of a horse race is dependent upon
mere chance, and has twice held that maintaining a
place to which individuals can resort for the purpose
of wagering money upon the outcome of such races
constitutes a common law nuisance prohibited by § 14-
722, Oregon Code 1930.

At the time when the lottery provision of our con-
stitution was proposed for adoption at the constitu-
tional convention various amendments were proposed
to it which sought to prohibit, in addition to lotteries,
''all games at billiards, ten pins and cards'' and ''all
species of gambling.'' These and other proposals were
rejected while the one prohibiting lotteries was re-
tained. See Carey's History of the Oregon Constitu-
tion, pages 367 and 368. Lotteries at that time were
institutions of great magnitude and their evil conse-
quences were far-reaching. The Federal Supreme
Court described their nature as of ''widespread pesti-
lence.'' See *Douglas v. Ky.*, 168 U. S. 496 (18 S. Ct.
199, 42 L. Ed. 553). For a further description of the
lotteries of that day and the manner in which their
operations were ofttimes facilitated by legislative ap-
proval see *In Re Dwyer*, 14 Misc 204 (35 N. Y. S. 884),
and *People v. Reilly*, 50 Mich. 384 (15 N. W. 520, 45 Am.
Rep. 47).

Certainty that someone would win is not an es-
sential element in gaming: *Fleming v. Bills*, 3 Or. 286;
*State v. Shorts*, 32 N. J. Law 398 (90 Am. Dec. 668);
*State v. Lovell*, 39 N. J. Law 463; State v. Lipkin, 169
N. C. 265 (84 S. E. 340, Ann. Cas. 1917D, 137, L. R. A.
1915F, 1018).

█ It seems clear that when the plaintiff formulated its plan it did not intend to set up a lottery. It also seems clear, from allegations of the complaint which we have not quoted, that one of the purposes of the plaintiff was to add interest to the breeding of good horses and that it intended that the predominant feature in its plan should not be chance but skill, judgment and horsemanship. We are satisfied that the plaintiff's plan is illegal but does not constitute a lottery. In our opinion, it is condemned by the principles of law previously mentioned and applied in *State v. Ayers* and *State v. Nease.* We, therefore, conclude that the operation of its scheme constituted the maintenance of a nuisance prohibited by § 14-722, Oregon Code 1930.

It follows from the foregoing that, although we do not agree with the circuit court's conclusion that the plaintiff's scheme constitutes a lottery, we agree with its decision which sustained the defendant's motion for judgment on the pleadings. It, therefore, follows that the judgment of the circuit court is affirmed.

BEAN, C. J., BROWN and BELT, JJ., concur.