Antonio Valdez and Charles M. Valdez v. State, *ex rel* J. Rex Farrior, State Attorney, Thirteenth Judicial Circuit.

194 So. 388

En Banc

Opinion Filed February 27, 1940

124

*Whitaker Brothers and Leroy Allen,* for Appellants;

*George Couper Gibbs,* Attorney General, and *Thomas J. Ellis,* Assistant Attorney General, for Appellee.

BUFORD, J.—This case is before us on petition for certiorari to review an order of the Circuit Court denying motion to dismiss bill of complaint and also order of the Circuit Court striking portions of defendants' answers.

The amended bill of complaint seeks to enjoin the operation of an alleged nuisance under the provisions of Section 5639 R. G. S., 7832 C. G. L., which is as follows:

"Whoever shall erect, establish, continue, or maintain, own or lease any building, booth, tent or place which tends to annoy the community or injure the health of the community, or become manifestly injurious to the morals or manners of the people as described in Section 7817 or shall be frequented by the class of persons mentioned in Section 7655, or any house or place of prostitution, assignation, lewdness or place or building where games of chance are engaged in violation of law or any place where any law of the State of Florida is violated, shall be deemed guilty of a nuisance, and the building, erection, place, tent or booth and the furniture, fixtures and contents are also declared a nuisance, and all such persons, places, shall be abated and enjoined as provided in Article 19, Chapter X, Title III, Second Division of these Compiled General Laws."

Section 7817 referred to in the above section provides: "All nuisances which tend to annoy the community or injure the health of the citizens in general, or to corrupt the public morals, shall be indictable and punishable by a fine not exceeding two hundred dollars, at the discretion of the court; and any nuisance which tends to the immediate an-

noyance of the citizens in general, or is manifestly injurious to the public health and safety, or tends greatly to corrupt the manners and morals of the people, may be removed and suppressed by the order of the justice of the peace of the district, founded upon the verdict of twelve householders of the same, who shall be summoned, sworn and impaneled for that purpose, which order shall be directed to and executed by any sheriff or constable of the county; and an indictment shall lie for the same."

Section 7655 provides:

"Rogues and vagabonds, idle or dissolute persons who go about begging, common gamblers, persons who use juggling, or unlawful games or plays, common pipers and fiddlers, common drunkards, common night walkers, thieves, pilferers, traders in stolen property, lewd, wanton and lascivious persons, keepers of gambling places, common railers and brawlers, persons who neglect their calling or employment, or are without reasonably continuous employment or regular income and who have not sufficient property to sustain them, and misspend what they earn without providing for themselves or the support of their families, persons wandering or strolling around from place to place without any lawful purpose or object, habitual loafers, idle and disorderly persons, persons neglecting all lawful business and habitually spending their time by frequenting houses of ill fame, gaming houses or tippling shops, persons able to work but habitually living upon the earnings of their wives or minor children, and all able bodied male persons over the age of eighteen years who are without means of support and remain in idleness, shall be deemed vagrants," * * *.

The amended bill of complaint alleges, *inter alia:*

"Second: That the defendants, Antonio Valdez and Chas. M. Valdez, keep and maintain in said Hillsborough

County, a nuisance, as defined in Section 7832, Compiled General Laws of Florida, 1927; that said nuisance consists of unlawfully operating, promoting and conducting lotteries for money, commonly known as 'Bolita,' 'Cuba,' and 'Bond' in that certain building known and described as 3607 Nebraska Avenue, commonly known as 'Charley's Restaurant' in the City of Tampa, County of Hillsborough and State of Florida, which building is located on Lot 11, Block 1, Francis Subdivision, as the same is recorded in the office of the Clerk of the Circuit Court of Hillsborough County, Florida, in Plat Book 4, page 45; that said real estate is owned by the defendants, Antonia Valdez and Chas. M. Valdez.

"Third: That the defendants, Antonio Valdez and Chas. M. Valdez, on August 29, 1939, and at divers times and dates before and after said date, has at and in said premises maintained and continued in said place and premises a public gaming and gambling place and now so continues the same; that said premises are open to the public and divers numbers of persons frequent said premises for the purpose of gaming and gambling by purchase for money tickets in lotteries known as 'Bolita,' 'Cuba' and 'Bond,' in open and wilful disregard and violation of the laws of the State of Florida, and in contempt and disregard of and injury to the public morals, welfare and the decency of the community."

The bill then continues describing the manner in which *"said lotteries are operated."*

We must hold that the allegations of the bill of complaint are sufficient to withstand the motion to dismiss because, as heretofore pointed out by quoting from the bill of complaint, the allegations are that "said nuisance consists of unlawfully operating, promoting and conducting lotteries for money," and that the defendants "at divers times and

dates before and after said date has on and in said premises maintained and continued in such place and premises a *public gaming* and *gambling* place and now continues the same; that said premises are open to the *public* and divers numbers of persons frequent said premises for the purpose of gaming and gambling by purchase for money of tickets in lotteries known as" etc. * * *. (Emphasis supplied.)

It is hardly necessary for us to attempt to add anything to what was said by this Court in the case of Pompano Horse Club, *et al.,* v. State, 93 Fla. 415, 111 Sou. 801. In that case we said, *inter alia:*

"Where the State is concerned, the presence of actual injury is not an essential element of or prerequisite to chancery jurisdiction. Littleton v. Fritz, 22 N. W. Rep. 641; State v. Marshall, 56 South. Rep. 792; Ann. Cas. 1914A 434, wherein it is said: "When a business is a public nuisance, no matter how it gets to be such, whether inherently so or made so by the law, the Court of Chancery has power to enjoin.' See also State v. Canty, 105 Atl. Rep. 118; *Ex Parte* Allison, 90 S. W. Rep. 870; 2 L. R. A. (N. S.) 1111; 20 R. C. L. 474; Respass v. Com., 115 S. W. Rep. 1131; 21 L. R. A. (N. S.) 836; State v. Noyes, 30 N. H. 279; Jones v. State, 132 Pac. Rep. 319; 44 L. R. A. (N. S.) 161 Ann. Cas. 1915C 1031; 20 R. C. L. 386; 14 R. C. L. 379, and cases cited in note 11; also *idem* page 380; Ehrlick v. State, 64 S. E. 935; 23 L. R. A. (N. S.) 691; State v. Gilbert, 147 N. W. Rep. 853; State v. Wagener, 80 N. W. 633; 46 L. R. A. 442.

Even at the risk of some tedium, we quote finally from 5 Pomeroy's Equity Jurisprudence (2nd Ed.) Section 1893.

" 'As a public nuisance concerns the public generally it is the duty of the government to take measures to abate or enjoin it. Hence it follows that the government can obtain an injunction restraining a public nuisance, without

showing any property right in itself. The duty of protecting the property right of all its citizens is sufficient warranty in issuing the injunction. Therefore, wherever a public nuisance is shown, equity must enjoin it at the suit of the government. Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated, is a public nuisance.'

"It does not lie within the legislative power to arbitrarily or capriciously declare any or every act a nuisance. State v. Saunders, 25 Atl. Rep. 588; 18 L. R. A. 646. 'It does not at all follow that every statute enacted ostensibly for the promotion of these ends (the preservation of the public health, safety and morals) is to be accepted as a legitimate exertion of the police power of the State.' Mugler v. Kansas, *supra*. It rests, however, very largely within the province of the legislative body to prescribe what shall constitute a nuisance, and in defining nuisances the legislature may rightfully exercise a broad and extended discretion. Lawton v. Steel, 152 U. S. 133; 38 Law. Ed. 385; 20 R. C. L. 404, and cases cited. It may make that a nuisance which was not one at common law. U. S. v. Reisenweber (C. C. A.), 288 Fed. 520, 524. That being true, certainly the legislative body in the rightful exercise of its power to preserve and protect the public morals and safety of its citizens may lawfully denounce and prohibit gambling as a criminal offense, and at the same time declare to be public nuisances, and abatable by injunction, places or premises which are resorted to or kept for the purpose of gambling or of staking, betting or wagering money or other thing of value upon the result of horse races. It is held by the courts with great unanimity that such acts are subversive of the public morals, and their suppression a lawful exercise of the recognized authority of the State. That gaming and gambling might be conducted in such a

manner as to constitute a nuisance was probably recognized even by the early common law. King v. Medler, 2 Shower 36; King v. Dixon, 10 Mod. 335; State v. Vaughn, 98 S. W. Rep. 685; 7 L. R. A. (N. S.) 899; People v. Wietoff, 16 N. W. Rep. 442; Mullen v. Mosely, 90 Pac. Rep. 986; 13 Ann. Cas. 450; 12 L. R. A. (N. S.) 394; 20 R. C. L. 404 (23); Thrower v. State, 45 S. E. Rep. 126; McClean v. State, 9 Atl. Rep. 681; Bollinger v. Com., 35 S. W. Rep. 553. See also the Statute of Anne, 9 Anne. Chap. 14, adopted in this State as part of the common law of England; Braxton v. Pye, 2 Wils. 309; Woolf v. Hamilton, 2 Q. B. 337; Hyams v. King Stuart, 2 K. B. 696.

By the decided weight of authority, the maintenance of a pool room, or turf exchange where persons congregate for the purpose of making bets and wagers on horse races run in other states or countries is a public nuisance, and abatable as such by injunction under statutes similar to our own. Jones v. State, 132 Pac. Rep. 319; Ann. Cas. 1915C 1031, 1033; 44 L. R. A. (N. S.) 161; State v. Vaughn, 98 S. W. Rep. 685; 7 L. R. A. (N. S.) 899; 11 Ann. Cas. 277; Bollinger v. Com., 35 S. W. Rep. 553; Cawein v. Com. 61 S. W. Rep. 275; Ehrlick v. Com., 103 S. W. Rep. 289, 10 L. R. A. (N. S.) 995; Respass v. Com., 102 S. W. Rep. 331, and the many other cases cited in Ann. Cas. 1915C, 1033. See also: James v. State, 112 Pac. Rep. 944, 34 L. R. A. (N. S.) 515; Com. v. Respass, 115 S. W. Rep. 1131; 21 L. R. A. (N. S.) 836, and the many cases cited in the note thereto; State v. Ayers, 88 Pac. Rep. 653; 10 L. R. A. (N. S..) 992; Swigart v. People, 50 Ill. App. 181. See also Miller v. U. S., 6 App. (D. C.) 6, in which it is held that 'book making' or pool selling located near a race track is a common nuisance within the meaning of the Act of Congress of January 31, 1883, passed to suppress gambling in the District of Columbia."

So it follows that not every place where gambling may be permitted may be abated as a nuisance but when it is permitted under such conditions and circumstances as to offend against the good morals or the finer sensibilities of the people of the community the jurisdiction of equity may be invoked to abate it as a nuisance. A game of chance may be conducted in such a manner as to violate the criminal law and yet not be abatable as a nuisance. For instance: a gentleman might invite a few personal friends into his private office and play an occasional game of penny-ante-poker, and be guilty of violating the law against gambling, though he might not be legally convicted of operating a gambling house or of maintaining a nuisance. Likewise, the keeper of a restaurant might hold a few tickets which he had purchased in a lottery and might sell one or more of those tickets to a friend and be guilty of a violation of the criminal law and yet not in anywise be maintaining a nuisance. But, if as is alleged in this bill of complaint, the keeper of a restaurant made it a business to sell tickets in "Bolita," "Cuba" or "bond" to the public and so conducted that part of his business as to let it be known to the public that such tickets could be purchased at his place of business and people who desired to engage in that unlawful enterprise frequented his place of business for the purpose of purchasing such tickets and participating in the lottery, then he offends against the public and, under the statute, *supra*, the jurisdiction of equity may be invoked to enjoin and abate the continuance of that enterprise and practice at or in that location. See Guy Fasson, *et al.*, v. State ex rel. Burton as State Attorney, filed at this Term of the Court.

So much for the denial of the motion to dismiss the bill of complaint. The motion to strike, which was granted, was, in part:

"First: That portion of said answer beginning with the words '4th. Further answering said bill of complaint, defendants aver——' appearing on the 7th line from bottom of page 4 thereof and continuing through page 5 thereof, through and concluding with the words 'in that it would permit the use of the process of a court of equity to legalize public gambling to be engaged in and conducted by one class of persons and public gambling condemned when engaged in by another class.' on the 4th line from the bottom of page 6 of said answer.

"And for grounds of said motion to strike this portion of said answer, plaintiff says:" * * *

Then follows grounds on which this part of the motion is predicated:

"Second. That portion of said answer beginning with the words '5th. Defendants further aver that the 1917 statute * * *—' beginning on the 3rd line from the bottom of page 6 of said answer and continuing through pages 6, 7, 8, 9 and 10 of said answer and concluding with the words 'and this proceeding amounts to using the court for the purpose of oppressing defendants.' on the 4th line from the bottom of page 10 of said answer."

Then follows grounds on which this part of the motion is predicated.

Later the motions were considered by the Court as applying to all amendments to the answer.

The portions of the answer stricken sought to set up as a defense in effect (1) that Sec. 7832, *supra,* was repealed by implication by Chapter 14832, Acts of 1931, commonly known as the Parimutuel Act; (2) that the State did not come with clean hands into a court of equity to enjoin the operation of a public gaming and gambling place because the State had by the enactment and operation of Chapter

14832, Acts of 1931, recognized gaming and gambling of a particular kind as a lawful enterprise and had become a party to such gaming and gambling enterprise by participating in the proceeds derived from the operation of such gaming and gambling place; (3) that the suit was not brought in good faith but was motivated by political reasons and set in motion by the irregular and unusual conduct of a grand jury or grand juries assembled in Hillsborough County and was promoted by designing persons, including newspapers, for political purposes.

The sole question for us to determine is whether or not these allegations of the answer and amendment thereto constitute a defense to the bill of complaint and the question of the propriety of the motives behind the suit, or the propriety of the alleged conduct of the allegedly designing persons and newspapers is not a matter to be determined in this proceeding.

Whether or not these allegations of the answer and amendment thereto constitute a defense is a proper question for us to now determine because the Chancellor has held by sustaining the motion to strike that they were not matters proper to be interposed as defenses and on this application for certiorari we must determine whether or not his order constituted error.

It is not necessary for us to determine the question of the constitutionality of Chapter 14832, Acts of 1931. Assuming that that Act is valid for the purpose here presented, we shall consider the questions above stated to have been raised by the answer.

A perusal of Chapter 14832, *supra,* discloses that it authorizes the operation of parimutuel pools only under limited conditions and at and in particular places. Therefore, we do not think and cannot hold, that that enactment of the legislature could have the effect of changing the public

policy of the State in regard to gaming and gambling and the operation of gambling houses as established by the General Statutes of Florida.

In the case of State *ex rel.* Hunter v. Araho, a case decided by the Supreme Court of Nebraska in which opinion was handed down on January 5th, 1940, and a copy of which opinion has been furnished to this Court by the office of the Attorney General, a like question was presented and the Court there held, *inter alias*

"At the general election held in November, 1934, an amendment to the above section of the Constitution was submitted to the voters of the State, and was carried, and thereafter Section 24, Art. III of our Constitution, as amended, had read as follows: 'The legislature shall not authorize any games of chance, lottery or gift enterprise; but nothing in this section shall be construed to prohibit the enactment of laws providing for the licensing and regulation of wagering on the results of horse races by the pari-mutuel or certificate method, when conducted by licensees within the race track enclosure at licensed horse race meetings.' Because of said amendment the defendants in the case at bar insist that this amendment declared a new policy in our state with references to betting on horse races, and had the effect of repealing any existing statutes with reference to horse race betting, and rendered former court decisions, holding that such betting constituted a game of chance and a lottery, of no effect as against the new declared policy of the state, as shown by the adoption of the amendment by the people of the state.

"Acting on the authority given in said amendment, the legislature at its session of 1935 adopted laws governing the state racing commission and horse racing with pari-mutuel wagering, and the same is found set out in Section 2-1501 to 2-1519, as set out in Compiled St. Supp. 1935; and there-

after, the same legislature also amended Sections 2-208, 28-932, 29-962, and 28-963, Comp. St. 1929, by adding thereto provisions that nothing therein should prohibit pari-mutuel wagering on horse races.

"Section 2-1513. Comp. St. Supp. 1935, sets out that the purpose of the Act was to encourage agriculture and horse breeding in the State of Nebraska, and that at each race meet there should, if possible, be at least one race on each racing day limited to horses foaled in Nebraska, and that 3 per cent of the first money of every purse won by a horse bred in Nebraska should be paid to the breeder of such horse. This law clearly and specifically sets out the purpose of pari-mutuel racing in Nebraska, and nothing therein indicates that the bars are to be thrown down, as the defendants argue, to permit gambling in Nebraska upon horse races which may be held in every state in the Union and in foreign countries, as it must be evident that such widespread gambling upon horse races was not within the scope of the amendment adopted by the majority of the voters of Nebraska, to permit only pari-mutuel betting and betting and gambling, or in the minds of the members of the legislature, who adopted Section 2-1513, *supra, but it only permitted a definite form, known as pari-mutuel horse race betting and required that the same must be conducted under license duly issued by the state racing commission, and be conducted in strict accordance with the conditions and limitations as set out in said law, which requires that it be conducted by licensees within the race track inclosure at licensed horse race meetings.*

. "In our opinion, nothing in the amendment to the Constitution of Nebraska, or in the laws passed to carry said change into effect, supports the contention of the defendants that the bars are now down on all forms of games of

chance, betting, and gambling in connection with horse races of any kind, wherever held."

In the case of People v. Cameo, 165 Misc. 134, 300 N. Y. Supplement 269, similar enunciations were promulgated.

While the allegations of the answer alleging improper motives behind the institution of the suit and irregularities and misconduct of the grand jury are voluminous and in strong and impressing language, they are not sufficient to constitute a defense to the suit here instituted by the State through its qualified official authorized by law to institute suit. It is generally established that the courts will not inquire into motives which actuate plaintiff in bringing suit. Where plaintiff shows a right to the relief sought it is immaterial that he is seeking it for other purposes than the ascertainment and enforcement of the rights upon which he relies. See 32 C. J. 67, and cases there cited; also 1 C. J. 971, 972; 1 R. C. L. 319, 320. Also see Ropes v. Stewart, 54 Fla. 185, 45 Sou. 30; Whitmore v. Patten, 84 Fed. 51.

We do not mean to hold, however, that the rule requiring one to come with clean hands into a court of equity does not apply to the State when it becomes a litigant the same as it does to any other litigant. The present writer is of the opinion that a court of equity is a court of conscience and whether or not it will lend its aid may be in many cases a matter to be determined in the exercise of sound judicial discretion of the Chancellor. For instance, if it should be alleged and shown in a suit of this sort that rival organizations or gangs were engaged in the operation of gambling houses and that the operations of such gangs in such manner was known to the State through its duly authorized officers and that the suit was instituted for the purpose of eliminating one of the rivals in such business, or a group of

such rivals, while the opposing group was allowed to continue in such known operations without hindrance and that, therefore, the purpose of the suit was to eliminate competition in behalf of the favored operator, or group of operators, the Chancellor would be warranted in exercising his judicial discretion and withholding the exercise of equity jurisdiction to aid in the accomplishment of such unholy and base purpose. The other members of the Court, however, feel that this question is not involved here.

We have carefully considered the able brief of counsel for appellants and the numerous authorities therein cited in support of their contentions but we are not convinced that the burden has been met requiring it to be made to appear that the court committed reversible error.

For the reasons stated, the writ of certiorari is denied.

TERRELL, C. J., WHITFIELD, BROWN, BUFORD and CHAPMAN, J., concur.

Justice THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.